**AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, PENNSYLVANIA SECTION, et al.**

v.

**Richard THORNBURGH, et al.**

**Civ. A. No. 82–4336.**

United States District Court,
E.D. Pennsylvania.

June 17, 1985.

Thomas E. Zemaitis, Laurence Z. Shiekman, Pepper, Hamilton & Scheetz, Kathryn Kolberg, Women's Law Project, Philadelphia, Pa., for plaintiff.

John O.J. Shellenberger, Deputy Atty. Gen., Chief, Eastern Region, Philadelphia, Pa., Andrew S. Gordon, Sr. Deputy Atty. Gen., Harrisburg, Pa., Ronald T. Williamson, Asst. Dist. Atty., Chief, Appellate Div., Norristown, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

HUYETT, District Judge.

Presently pending before me is the issue of whether or not to enjoin the Commonwealth of Pennsylvania from enforcing the public disclosure requirements of sections 3207(b) and 3214(f) of the Pennsylvania Abortion Control Act. In order to place the present issues in context, it is first necessary to review the history of this case, a case which has evolved into a procedural morass.

The Pennsylvania Abortion Control Act was enacted on June 11, 1982 and was scheduled to become effective 180 days thereafter. In October, 1982, plaintiffs filed their complaint and on October 29, 1982, they filed a motion for preliminary injunction. After a hearing on December 2, 1982 and after considering the parties' extensive stipulation of facts, their proposed findings of facts and conclusions of law and memoranda of law, I issued an order on December 7, 1982 granting a preliminary injunction as to § 3205 of the Act and denying plaintiffs' motion for a preliminary injunction as to the remainder of the Act. 552 F.Supp. 791.

Plaintiffs immediately filed a notice of appeal and the Commonwealth cross-appealed as to the twenty-four hour waiting period of section 3205. On December 9, 1982, the Third Circuit granted plaintiffs' request for a stay of enforcement of the Act pending the appeal. After briefing and oral argument, the Third Circuit ordered the case held pending Supreme Court decisions in three then-pending abortion cases. After the Supreme Court decisions were issued, the Third Circuit requested additional briefing, heard reargument, and on May 31, 1984 filed its opinion, 737 F.2d 283.

Defendants thereafter filed an appeal to the Supreme Court pursuant to 28 U.S. § 1254(2), challenging the Third Circuits' holding certain sections of the Act unconstitutional. The Supreme Court has recently stated that it will hear oral arguments in this case next term although the Court did not note jurisdiction. —— U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 297 (1985).

In the meantime, defendants filed a motion on July 20, 1984 to stay proceedings in this court pending the outcome of the appeal before the Supreme Court. Plaintiffs stated that they would not object to the stay of proceedings if the reports required by sections 3207(b) and 3214(f) were maintained confidentially, i.e. if the enforcement of the disclosure provisions of §§ 3207(b) and 3214(f) were enjoined. By order dated September 13, 1984, I granted defendants' motion for a stay with the proviso that any reports filed pursuant to sections 3207(b) and 3214(f) would be maintained in confidence by the Commonwealth and would not be made available for public inspection pending an early hearing on these matters. On February 7, 1985, a hearing was held at which plaintiffs presented the testimony of several witnesses and documentary evi-

dence; the defendants introduced several documents. After the hearing I requested additional briefing on several issues and then held oral argument on April 11, 1985.

The following constitute my findings of fact, discussion, and conclusions of law for purposes of a preliminary injunction.

## FINDINGS OF FACT

1. The total number of abortions performed in Pennsylvania from January 1 to December 31, 1983 and reported to the Pennsylvania Department of Health was 59,288.

2. Of the 59,288, 70.3 percent (41,656) were performed in free-standing clinics; 25.6 percent (15,176) were performed in hospitals, and 4.1 percent (2,456) were performed in doctors' offices.

3. In a letter dated March 12, 1979 and addressed to Senator Henry Messinger, Dr. Frank Weaver, D.O.F.A.C.O.O.G., stated that he felt harassed by having his name revealed pursuant to the Right-to-Know statute as that of a doctor who performed abortions. He suggested that one alternative for him might be to cease providing this service. Plaintiffs' Exhibit 2.

4. Prior to the enactment of the Abortion Control Act of 1982, it was the policy of the Department of Health of the Commonwealth of Pennsylvania to separate abortion records submitted by each facility licensed in the Commonwealth from the cover sheet which identified the facility. This policy was "to avoid the possibility that certain facilities and physicians could be pressured and possibly harassed by members of the public objecting to the medical abortion practice." Plaintiffs' Exhibit 7. It was the position of the Department of Health "that patient care may suffer if physicians or abortions clinics are under harassment..." *Id.*

5. The Pennsylvania Abortion Control Act became law on June 11, 1982 and was scheduled to go into effect 180 days thereafter.

6. Section 3207(b) states

Reports—Within 30 days after the effective date of this chapter, every facility at which abortions are performed shall file, and update immediately upon any change, a report with the department, which shall be open to public inspection and copying, containing the following information:

(1) Name and address of the facility.

(2) Name and address of any parent, subsidiary or affiliated organizations, corporations or associations.

(3) Name and address of any parent, subsidiary or affiliated organizations, corporations or associations having contemporaneous commonality of ownership, beneficial interest, directorship or officership with any other facility. Any facility failing to comply with the provisions of this subsection shall be assessed by the department a fine of $500 for each day it is in violation hereof. 18 Pa.Cons.Stat.Ann. § 3207(b).

7. Section 3214(f) states

Report by facility—Every facility in which an abortion is performed within the Commonwealth during any quarter year shall file with the department a report showing the total number of abortions performed within the hospital or other facility during the quarter year. This report shall also show the total abortions performed in each trimester of pregnancy. These reports shall be available for public inspection and copying. 18 Pa.Cons.Stat.Ann. § 3214(f).

8. Section 3202(d) states

Right of conscience—It is the further public policy of the Commonwealth of Pennsylvania to respect and protect the right of conscience of all persons who refuse to obtain, receive, subsidize, accept or provide abortions including those persons who are engaged in the delivery of medical services and medical care whether acting individually, corporately or in association with other persons; and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability or financial burden upon such persons or entities by reason of their refusing to act contrary to their conscience or consci-

entious convictions in refusing to obtain, receive, subsidize, accept or provide abortions. 18 Pa.Cons.Stat.Ann. § 3202(d).

9. The Bureau of Alcohol, Firearms and Tobacco investigated 30 bombings of abortion clinics and counselling centers in the years 1982, 1983, and 1984, twenty-four of which occurred in 1984. Plaintiff's Exhibit 9.

10. In a statement on January 3, 1985, President Reagan condemned the bombings of abortion clinics as violent, anarchist activities and directed the Justice Department to step-up its investigation of the attacks. Plaintiff's Exhibit 8.

11. Margaret K. Ross, Director of Educational Programs at Hillcrest Women's Medical Centers testified at the hearing on February 7, 1985. Ms. Ross testified in a candid, forthright manner and I found her to be a credible witness.

12. Hillcrest operates five medical facilities, two in the District of Columbia; one in Baltimore, Maryland; one in York, Pennsylvania, and one in Harrisburg, Pennsylvania. Tr. 12.

13. In the past year, the frequency of demonstrations at the Harrisburg Hillcrest Center has escalated as has the telephone harassment of the clinic. Telephone harassment includes calls to schedule bogus appointments. Tr. 15–16.

14. Security at the Harrisburg Hillcrest Center has been increased at the expense of the clinic. Tr. 17.

15. The York Hillcrest clinic opened on August 29, 1984. Protests were held that date both in front and behind the facility by pro-life groups. A group of people numbering approximately 150 paraded up and down the sidewalk and at times remained stationary blocking the entrance to the clinic. Tr. 20–22.

16. From nine to fourteen people were in the back of the building throughout the day on August 29 and would yell at cars entering and leaving the parking lot as well as try to prevent the cars from moving. Tr. 23–24.

17. On September 8, 1984, the protest outside the York Hillcrest clinic was repeated. A cameraman with an instacamera from WGCB–TV Channel 49 filmed events throughout the day and in particular focused the camera on persons entering and leaving the clinic. Tr. 26.

18. On September 8, 1984, a crowd at the back of the clinic harassed a young woman and two of her friends as they exited the clinic. The young woman had just had an abortion during which she had had an IV sedation. The crowd taunted the three women as they got into a car. The driver of the car hooked bumpers with another parked car which simply fueled the crowd to make comments such as "It looks pretty bad, but it's not as bad as what you just did in there." At this point, the patient got out of the car and tried manually to unhook the bumpers threatening physical injury to herself. Throughout this period, she was crying and becoming increasingly upset. Tr. 30–31.

19. On that same day, Ms. Ross had to go to a shopping center and pick up a prospective patient and her parents because they did not want to be identified by any community members because they feared reprisal. Tr. 34.

20. The York Hillcrest clinic has escalated its security by installing infrared eyes and on occasion hiring an armed private security guard. Tr. 35.

21. On November 2, 1984, the Court of Common Pleas for York County granted a temporary injunction against the protestors at the request of the York Hillcrest Center limiting the number of protestors at the clinic to five known persons. Tr. 35–36.

22. On November 3, 1984, the protestors violated the terms of the injunction by appearing in large numbers at the clinic and resuming their previous protest. The York Police, who were apprised of the situation told Ms. Ross that the temporary injunction was unenforceable. Tr. 37.

23. On January 1, 1985, the Hillcrest clinic in southwest Washington, D.C. was bombed. Tr. 38.

24. After that incident, at least one physician who performed abortions at the York Hillcrest Center refused to continue to perform procedures at the clinic for fear that the Clinic would be bombed. Two other physicians who perform abortions at the Harrisburg Hillcrest Center have refused to travel to the York Hillcrest Center out of fear of public reprisal and personal injury. Tr. 38–39.

25. The Hillcrest Women's Medical Centers advertise their services through the yellow pages of the telephone directory, through mailings of brochures to schools, referral agencies, and physicians. Prior to the opening of the York clinic, press statements were released to the effect that abortion services would be provided. Tr. 40–41.

26. Mary Banecker testified at the hearing on February 7, 1985 and because she testified in a candid and straightforward manner, I found her to be a credible witness.

27. Ms. Banecker is an administrator at the Northeast Women's Center in Northeast Philadelphia. Northeast provides abortion services along with other gynecological services. Tr. 52.

28. Protests have been held outside the clinic on the public sidewalk almost every Saturday since May, 1981. Tr. 53.

29. Since November 1984, the character of these protests has changed and become more intense. More people are involved and they yell at the staff members by name, calling them murderers and mercenaries.

30. Prior to November 1984, protests included protestors yelling at patients comments like "They're going to rip your baby's arms off. They're going to suck your baby's eyes out," causing patients to enter the clinic in tears. Tr. 57–8.

31. Protestors also distributed literature which contained pictures of aborted fetuses to persons entering and leaving the building in which the clinic is located. Plaintiff's Exhibits 10 and 11.

32. On the Saturday before Thanksgiving 1984, three people went to the clinic waiting room and started to distribute literature to persons sitting in the room. After they were told that they were trespassing, they slowly left the building. Tr. 60.

33. On December 8, 1984, there was another incident inside the clinic. About 50 people stormed into the clinic building and upstairs into the clinic. Several protestors pushed their way through to the recovery room where they scattered pro-life literature and put stickers reflecting a fetus on the sheets under the pillows and on a number of supply items. Tr. 63.

34. Despite several requests by clinic staff members for the protestors to leave, they remained stationary while some sang. Tr. 64.

35. One lab technician, Maryann Cass, was injured when some of the protestors tried to get into the lab where she was taking blood. She had been repeatedly hit by the door which she tried to keep closed and sustained injuries to her legs and back which caused her to miss two weeks of work. Tr. 64–65.

36. When the police arrived, the demonstrators continued to refuse to leave. After a final warning, the police started physically removing protestors from the clinic and placing them under arrest. Ultimately 31 persons were arrested. Tr. 65–66.

37. In the summer of 1983, the Northeast Center obtained an injunction from Judge Takiff of the Court of Common Pleas for Philadelphia enjoining pickets of more than six persons at a time and enjoining any abusive threats aimed at persons entering or leaving the clinic. Plaintiff's Exhibit 12.

38. The protestors continually violated the injunction. Northeast contacted the Sheriff's Office to enforce the injunction and paid an officer time and one-half to do so. Tr. 69.

39. The Sheriff however merely monitored the situation and never took any affirmative action to enforce the injunction. Tr. 69.

40. Pro-life protestors picketed the home of Ms. Banecker one week before the February 7, 1985 hearing carrying signs which said "Banecker's business is to butcher babies for big bucks" and "Mary Banecker, Hitler would be proud of you." Tr. 71–75.

41. The Northeast Center received three bomb threats during the month of December 1984. The clinic was evacuated at the time of one threat because a 45-minute deadline was given. One patient was under general anesthesia at the time and woke up outside the building. Tr. 75.

42. Northeast Women's Center advertises its abortion services in the yellow pages, several newspapers, and on the radio. The Northeast Center also publishes a resource directory which is sent to physicians and referral agencies. Tr. 74–76.

43. Access to the Northeast Center is unlimited, and people are free to walk into the building in which the clinic is located and into the clinic itself. Tr. 79.

44. Elizabeth Lincoln, Director of Counselling and Training for Women's Health Services, Incorporated, testified at the hearing on February 7, 1985. I found her to be a candid and credible witness who qualifies as an expert in counselling, capable of testifying about the impact on women of passing through anti-abortion demonstrations before having abortions procedures or counselling.

45. Abortions are performed at Women's Health Services on Tuesdays, Fridays, and Saturdays. On the weekdays, two people routinely appear at the clinic to pass out leaflets against abortion. On Saturdays, before the Supreme Court decisions in 1983, a number of passive protestors would demonstrate outside the clinic. They would pray, chant or sing, and say the rosary. Tr. 94.

46. Since 1983, the demonstrators have become more aggressive in yelling and calling out to patients entering and leaving the clinic. The signs that are carried at these demonstrations have become much more graphic and contain pictures of fetuses or various cut-up doll parts with signs reading "pro-choice meats." Plaintiffs' exhibits 14–21.

47. Women's Health Services has installed a sophisticated electronic security system and on Saturdays employs an off-duty police officer. Tr. 98.

48. Women's Health Services has also hired additional personnel to sit out in the hallway to ensure that no protestors enter the clinic and to ensure that patients arriving are not being hassled by protestors. Tr. 98.

49. During the past year, a pro-life person was able to break into the Services' phone lines through a CB radio and would interrupt phone calls to the clinic and would tell callers not to make appointments. Because the clinic was concerned that protestors might be able to copy information that a prospective patient gave over the telephone, the clinic ceased making appointments by telephone until they had new equipment installed to inhibit break-ins from other sources. Tr. 99–100.

50. One bomb threat was received at Womens' Health Services during the last year. Tr. 100.

51. In her expert opinion which I credit, Ms. Lincoln testified that the impact of demonstrations like those occurring outside the Womens' Health Services clinic on women entering the clinic to obtain an abortion is to make the experience much more difficult for them by making them feel more socially isolated and sometimes increasing their feelings of guilt and sense of trauma. Tr. 101–103.

52. Ms. Lincoln also testified that the long-term effect on women is to lengthen the time it takes them to resolve their emotional feelings about the abortion procedure.

53. Ms. Lincoln, in connection with the incident behind the York Hillcrest clinic involving the young woman who had just undergone an abortion and was then subjected to harassment by a pro-life crowd as she left the clinic, testified that she believes that the woman would suffer lifelong

effects of the trauma to which she was subjected. Tr. 107–108.

54. Womens' Health Services advertises in the newspaper, yellow pages, and on the radio. Tr. 107–108.

55. Sylvia Stengle, Director of the Allentown Women's Center, testified at the February 7th hearing in a candid and forthright manner, and I found her to be a credible witness.

56. Allentown Women's Center performs first trimester abortions. The Center opened in October 1978. Tr. 118.

57. Since the Center opened there have been frequent Saturday pickets at the Center.

58. The intensity of these pickets increased in the early fall 1984. Tr. 118.

59. On October 6, 1984, there was a demonstration at the Allentown Women's Center orchestrated by Bishop Welsh of the Roman Catholic Diocese with much advanced publicity and meetings with the press. Nearly 450 protestors picketed on that day outside the clinic. No abortions were performed on October 6, 1984 because it was Yom Kippur. Tr. 119.

60. On October 13, 1984, one week later, the protest was repeated by about 40 people. The confrontational level that day was high with protestors snapping pictures of patients entering and leaving the clinic and jumping in front of cars with placards. Patients upon entering the clinic through the demonstration were visibly upset and distressed. Tr. 120–121.

61. A woman, representing herself as a reporter for the Wilkes-Barre paper went to the clinic to interview Ms. Stengle and then asked questions about how long Ms. Stengle had been killing babies. It turned out that although she had been a stringer for the paper, the woman was not on assignment at the time and was a pro-life supporter. Tr. 122.

62. The Allentown Women's Center advertises its abortion services in the yellow pages, college newspapers, and mailings to physicians and social workers. Tr. 124–125.

63. Sheila Miller, clinic administrator for the Women's Suburban Clinic, testified at the February 7, 1985 hearing in a candid and straightforward manner and I found her to be a credible witness.

64. For the past eight to nine months, protests have been held outside the Clinic three days a week.

65. On July 3, 1984, about 100 demonstrators appeared outside the Women's Suburban Clinic. Thirty to forty of these individuals barged into the Clinic with their arms in front of them blocking passage of anyone who wanted to get to the door or to stop them. Protestors started harassing the clients telling them not to kill their babies. It took the police two and one-half hours to remove all of the protestors. Outside another 100 demonstrators continued to picket. Nineteen people were arrested. Two state legislators, Peter Vroon and Joseph Pitts accompanied the pickets outside and supported the activity of those who entered the building. Tr. 133–36; Plaintiffs' Exhibits 22–27.

66. On July 10, 1984, there was another demonstration by approximately fifteen people, several of whom tried to get into the Women's Suburban Clinic, but the doors were locked. One patient knocked at the door crying to be let in because two anti-abortion people were "hounding" her. These two protestors had just that day been released from jail for having entered the Clinic the week before. The police again arrested these individuals. Tr. 137.

67. An injunction was entered by Judge Wood of the Court of Common Pleas for Chester County after the July 3, 1984 incident limiting the scope of the protests. A final injunction was entered on October 29, 1984.

68. One doctor who performs abortions at the Suburban Clinic has been picketed at home. Tr. 140.

69. The Suburban Clinic advertises its services in the yellow pages, local medical services directories, and by mailings to physicians.

## DISCUSSION

### A. Parties' Contentions

The present posture of this case is unusual to say the least because plaintiffs never requested a preliminary injunction as to the disclosure requirements of sections 3207(b) and 3214(f). Rather, they opposed a stay of the proceedings as to the two provisions. I ordered a stay of the proceedings pending the appeal to the Supreme Court in order to avoid breaking this case into too many discrete pieces with the proviso that enforcement of the disclosure requirements of §§ 3207(b) and 3214(f) be enjoined. The proviso on the stay was the equivalent of a temporary restraining order necessitating a hearing before I could impose a preliminary or final injunction. This hearing was held on February 7, 1985.

At oral argument on April 11, 1985, plaintiffs argued that this aspect of the case is ripe for final disposition and that a permanent injunction would be appropriate at this stage. I am concerned, however, with making this case more complex that it presently is and want to avoid making piecemeal final orders. Moreover, the Commonwealth opposes a permanent injunction at this time. Therefore, the question presently pending before me shall be treated as a request by plaintiffs for a preliminary injunction, and the standards generally applied when considering a request for a preliminary injunction will be applied.

Plaintiffs contend that the disclosure requirements of sections 3207(b) and 3214(f) impose a legally significant burden on a woman's fundamental right to seek an abortion or abortion counselling and on the physicians and staff members who provide abortion procedures and counselling. Disclosure under these provisions, plaintiffs claim, will substantially interfere with the right to free association, the right of privacy to make personal decisions, and the right of informational privacy. Therefore, because disclosure would threaten the free exercise of constitutionally protected rights, plaintiffs argue, the state must justify such disclosure with a compelling state interest that is substantially related to the information disclosed.

Defendants contend that no burden is imposed by the disclosure requirements on a woman's right to obtain an abortion. Moreover, defendants claim, the disclosure requirements are justified by important state interests including ensuring that shoddy practitioners do not hide behind the corporate veil, aiding citizens in the exercise of their first amendment rights to oppose abortion, providing a pool of statistical and medical knowledge, and protecting the public's freedom to choose medical providers in accordance with their beliefs.

### B. Standard for Preliminary Injunction

■ The granting or denial of a request for preliminary injunction is ordinarily discretionary with the trial judge. This discretion is necessary because of the "infinite variety of situations which may confront" the court. *A.L.K. Corp. v. Columbia Pictures Indus., Inc.*, 440 F.2d 761, 763 (3d Cir.1971). A preliminary injunction is an extraordinary and drastic remedy. The power to issue an injunction must be used sparingly, and relief should not be granted except in rare instances in which the law, the facts, and equities are clearly in the moving party's favor. *See* 7 Wright & Miller, Federal Practice & Procedure, § 1948, at 428–29 (1973).

■ To prevail on a motion for a preliminary injunction, the moving party must demonstrate: (1) that he is likely to prevail on the merits of the controversy, and (2) that he will be irreparably harmed *pendente lite* unless the motion is granted. In addition, the court should take into account, when relevant, (1) the possibility of harm to other interested parties from the grant or denial of the injunction, and (2) the public interest. Essentially, the court must balance the existing interests. *Oburn v. Shapp*, 521 F.2d 142, 147–48 (3d Cir.1975).

### C. Likelihood of Success on the Merits

■ Plaintiffs must demonstrate a *prima facie* case showing a reasonable proba-

bility that they will prevail on the merits. *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir.1970). Plaintiffs, therefore, must establish that there is a reasonable probability that the disclosure requirements of §§ 3207(b) and 3214(f) will impose a legally significant burden on a fundamental right such as a woman's right to obtain an abortion. If a legally significant burden is established, the state must justify the disclosure requirements by a compelling state interest. If no burden is established, the issue is simply whether the state has a rational basis for requiring disclosure of the information obtained from the abortion facilities.

Beginning with *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court has recognized that the fundamental constitutional right of privacy encompasses the right of a woman to decide whether or not to terminate her pregnancy. *See City of Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 103 S.Ct. 2481, 2487, 76 L.Ed.2d 687 (1983); *American College of Obstetricians v. Thornburgh*, 737 F.2d 283, 291 (3d Cir. 1984). Courts have also consistently recognized that, because abortion is a medical procedure requiring the advice and assistance of competent, trained medical personnel, a woman, to fully vindicate her fundamental rights, needs to have available to her a physician who is free to exercise his or her best medical judgment. *City of Akron*, 103 S.Ct. at 2491; *American College*, 737 F.2d at 291. Regulations affecting physicians and abortion clinic staff members potentially interfere a woman's right to obtain an abortion and woman's right to associate with the medical and counselling services necessary to effectuate the abortion decision.

In *Roe v. Wade*, the Court held that no compelling state interest justifies a sweeping prohibition of abortion and further concluded that during the first trimester of the pregnancy, little or no regulation is permissible. Even minor regulations on the abortion procedure may not interfere during the first trimester with physician-patient consultation or with the woman's choice between abortion and childbirth. *City of Akron*, 103 S.Ct. at 2493. At the same time, the Supreme Court has held that the right to privacy which includes a woman's right to terminate her pregnancy, while fundamental, is not absolute and the woman's fundamental right must be balanced against important state interests in abortion. *Roe*, 410 U.S. at 154, 93 S.Ct. at 727. *City of Akron*, 103 S.Ct. at 2491.

Two state interests which may justify state regulation of abortion have been identified by the Supreme Court. First, a state has an important and legitimate interest in protecting potential life. This interest, however, cannot become compelling until viability, *i.e.*, when the attending physician concludes that there is a reasonable likelihood of the fetus's sustained survival and meaningful life outside the womb. The second identified interest is the state's concern in maternal health which the *Roe* court concluded does not become compelling until "approximately the end of the first trimester of pregnancy." *Roe*, 410 U.S. at 163, 93 S.Ct. at 731.

With these principles in mind, my first inquiry must be whether the disclosure requirements of sections 3207(b) and 3214(f) impose a legally significant burden on a woman's fundamental right to obtain an abortion. Plaintiffs contend that the compelled disclosure of the identity and location of facilities at which abortions are performed; the identity and location of their parent, subsidiary or affiliated organizations and corporations; and the total number of abortions performed at each facility and the number in each trimester as required by §§ 3207(b) and 3214(f) will subject women who seek medical services from those entities and their physicians and staff members to unwanted and unwarranted acts of violence, threats, intimidation and harassment from opponents of abortion. By subjecting women and their physicians to hostile acts by third parties opposed to abortion, the disclosure, plaintiffs contend, will have the effect of intruding both upon a woman's right of association with her medical personnel and upon her right of

privacy in deciding whether or not to have an abortion. Plaintiffs further argue that compelled disclosure infringes upon the right of informational privacy.

Three years ago when I considered these same provisions, I concluded that plaintiffs had not established that disclosure would impose a legally significant burden on the abortion decision. *American College*, 552 F.Supp. 791, 803–04 (E.D.Pa.1982). Similarly, the Third Circuit concluded that plaintiffs (appellants) had not "as yet demonstrated a nexus between the disclosure of such information [§ 3207(b)] and the chilling of constitutional rights." *American College*, 737 F.2d 283, 297 (3d Cir.1984). Much has happened in the intervening three years and plaintiffs provided sufficient evidence at the February 7, 1985 hearing for me to conclude that the disclosure provisions would impose a legally significant burden on a woman's fundamental right to obtain an abortion.

■ During the past year, a Presidential election year, abortion became a hotly contested political issue. As the evidence adduced at the hearing shows, pro-life protests have increased in frequency and intensity and at times have exploded into violent confrontations. In 1984, there were twenty-four bombings of abortion clinics nationwide compared with six in the previous two years combined. Several of plaintiffs' witnesses testified about takeovers of clinics by pro-life demonstrators which have resulted in arrests of up to thirty people at a time. Women entering and leaving clinics have been verbally harassed; the effect of such harassment has been to increase the level of anxiety a woman feels and to exacerbate any emotional problems associated with the abortion decision and procedure which in turn may have an adverse effect on the medical procedure itself and on the patient's psychological well-being thereafter. The Pennsylvania Department of Health recognized in 1980 that "patient care may suffer if physicians or abortion clinics are under harassment." Plaintiff's Exhibit 7. The pattern of hostile behavior which has developed in the past two years has also included picketing and verbal harassment of clinic physicians and staff members by name both at their facilities and at their homes and attempts to block ingress and egress at facilities.

Conceding that some women may have experienced "heightened anxiety and guilty feelings," defendants nevertheless contend that plaintiffs failed to provide any evidence that a woman's right to obtain an abortion would be obstructed or impeded by disclosure. Defendants further contend that because the majority of facilities which perform abortions, including the five clinics about which there was testimony at the hearing, advertise the availability of their services, plaintiffs cannot establish that the disclosure requirements of § 3207(b) and 3214(f) impose a legally significant burden on a constitutional right. Even if physicians who perform abortion procedures in their offices, accounting for 4% of the abortions in the Commonwealth in 1983, do not advertise and would discontinue providing abortions if subjected to the disclosure provisions, defendants contend, there would be no legally significant impact on a woman's right to obtain an abortion.

Relying on a line of cases in which the Supreme Court has adopted a flexible standard of proof where disclosure requirements are challenged, plaintiffs argue that a finding of a "reasonable probability" that the threats, intimidation, or harassment may result from disclosure of information is sufficient to warrant a conclusion that public disclosure will impose an legally significant burden on a woman's fundamental right to obtain an abortion. In *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982), the Court, holding that evidence of specific incidents of private and government hostility towards the Socialist Workers Party and its members during the four years preceding trial was sufficient to establish that disclosure would chill first amendment rights of association, the Court specifically rejected the position that direct proof that disclosure of information would

subject the individuals to threats, intimidation or harassment was necessary. Rather, the Court, adopting the test set forth in *Buckley v. Valeo*, 424 U.S. 1, 72, 96 S.Ct. 612, 660, 46 L.Ed.2d 659 (1976) stated: "The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisal from either Government officials or private parties." 459 U.S. at 93, 103 S.Ct. at 420–21. The Court, therefore, declared unconstitutional an Ohio statute requiring every political party to report the names and addresses of campaign contributors and recipients of campaign disbursements. *See also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (In light of evidence of past incidents of retaliation upon disclosure, compelled disclosure of the NAACP's membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort.)

Each of the cases arose in the context of minority political organizations seeking protection from reprisal, threats, and violence. For this reason, defendants contest plaintiffs' reliance on them and contend that they address problems unique to minor political parties which have demonstrated a long history of official and unofficial oppression. In contrast to the right of political advocacy at issue in *Brown* and *NAACP*, defendants note, the right to obtain an abortion has been qualified. Moreover, defendants argue, plaintiffs here are simply advancing their right to do business and the right of their patrons to take advantage of the services they offer.

■ I conclude that the flexible standard of proof established in *Buckley* and *Brown* for cases involving challenges to disclosure provisions is applicable here and, therefore, defendants' arguments must be rejected.[1] That the right to obtain an abortion is not absolute and is subject to certain qualification does not render the *Brown* standard inapplicable. As counsel for plaintiffs argued, one must look to how the right to obtain an abortion has been qualified and in particular must recognize that in the first trimester the right to obtain an abortion is absolute. Furthermore, the concern reflected in the Court's decisions in *Brown* and *Buckley* to the effect that it is frequently difficult to prove a direct impact on the exercise of constitutional rights by future enforcement of a statute that requires public disclosure of otherwise private information applies equally here.

It would be unreasonable to require plaintiffs to produce the testimony of a woman who if forced to pass through a crowd of heckling protestors would decide not to have an abortion or the testimony of a woman who has already been the target of protestors because to do so would be to subject these women to the very public scrutiny which they wish to avoid. Similarly, a physician who willingly performs abortions but who would not do so if his practice were disclosed to those opposed to abortion is likely to refuse to testify.

1. When reviewing my earlier decision as to the disclosure requirements of § 3207(b), the Third Circuit stated:

> Appellants have not as yet demonstrated a nexus between the disclosure of such information and the chilling of constitutional rights. Therefore we find inapposite *Brown v. Socialist Workers '74 Campaign Committee* [459 U.S. 87], 103 S.Ct. 416 [74 L.Ed.2d 250] (1982), on which appellants rely, where the Court held that compelled disclosure of party contributor lists may reasonably lead to harassment based on associational ties.

737 F.2d at 297–98. I interpret this language to mean that because plaintiffs had not presented any evidence showing any nexus or relation between disclosure and the chilling of constitutional rights, the question of whether or not the standard of proof set forth in *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 93, 103 S.Ct. 416, 421, 74 L.Ed.2d 250 (1982) applied was never reached. Now, plaintiffs have established such a relation and the questions are whether disclosure would impose a legally significant burden on the fundamental right to obtain an abortion which can only be justified by a compelling state interest and to what standard of proof plaintiffs are to be held in establishing that burden. I have concluded that *Brown* and *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) provide the answer to the second issue.

Applying the *Brown* standard, I conclude that there is a reasonable probability that the disclosure requirements will result in increased threats, harassment, or reprisals and will therefore impose a legally significant burden on the constitutional right to choose to have an abortion.[2] Plaintiffs have clearly shown past harassment of women seeking abortions and of physicians, staff members and clinics which provide abortion services.

The evidence shows a pattern of increased protests and hostility at each of the clinics about which there was testimony; the protests have, at times, led to violence and the protestors have shown a marked disregard for court-issued injunctions. The clinics have been forced to increase security at their own expense. Yet despite the increased security, incidents like that at Northeast Center in December, 1984, where a bomb threat was received and because of the time deadline the clinic was evacuated and one patient who had been under a general anesthetic awoke on a gurney in the parking lot, still occur. As the expert testimony of Ms. Lincoln showed, a woman forced to pass through a crowd of heckling, hostile people, to enter a facility to obtain an abortion suffers heightened anxiety and guilt feelings which may not only affect the medical procedure itself but also cause long-term effects on her mental state. The Commonwealth has long recognized this fact, Plaintiffs' Exhibit 7, and produced no evidence to the contrary at the February 7 hearing. Moreover, hostility like that displayed by many protestors outside a clinic intrudes on a woman's right to decide for herself whether or not she is going to have an abortion.

■ Disclosure of information such as that which must be reported pursuant to sections 3207(b) and 3214(f) would provide groups opposed to abortion with a comprehensive list of all facilities in the Commonwealth at which abortions are performed, the number of abortions performed by each in total and by trimester, and the name and address of any parent, subsidiary or affiliated organizations, corporations, or associations which would otherwise not be available. Defendants contend, however, that because the five clinics about which there was testimony at the hearing advertise the availability of abortion services, plaintiffs cannot establish that disclosure will impose a legally significant burden on a woman's right to obtain an abortion.[3] Although

2. My conclusion here is not intended to reflect in any way on the rights of those opposed to abortion to espouse their views. Although it is implicit in the conclusion that disclosure requirements impose a legally significant impact on the right to obtain an abortion that the actions of the protestors interfere with a woman's right to decide whether or not to terminate her pregnancy, the conclusion that disclosure requirements are unconstitutional has no bearing on the protestors' rights to continue to espouse their views on abortion publically, outside clinics, hospitals, physicians' offices or elsewhere. As Judge Wood noted when entering a permanent injunction on October 29, 1984 against a number of people who had demonstrated against abortion at the Woman's Suburban Clinic, the infringement on a woman's right to obtain an abortion must be balanced against the first amendment rights of those opposed to abortion. *Womans' Suburban Clinic v. Roberta Nelson, et al.,* No. 84–04888, slip op. (Court of Common Pleas of Chester County, Pennsylvania, October 29, 1984). The Commonwealth, however, may not adopt the first amendment rights of those opposed to abortion as its justification for state compelled disclosure when disclosure of the information required by sections 3207(b) and 3214(f) will have the likely effect of increasing the burden caused by anti-abortion activity. Therefore, there is no constitutional right balancing against the infringement on woman's right to have an abortion.

3. In their supplemental memoranda of law, the parties debate the question of which party bears the burden of proof with respect to advertisement. Plaintiffs contend that advertisement is a matter of defense and therefore the burden was on the defendants to produce evidence that all of the facilities, hospitals and physicians that perform abortions advertise. Defendants, on the other hand, contend that advertisement goes to the burden disclosure will impose on the right to obtain an abortion and therefore the burden of proof is on the plaintiffs to establish that there are providers of abortions who do not presently advertise and who would be adversely affected by public disclosure. I have concluded that defendants are correct that advertisement is an element of the "burden" imposed by disclosure and therefore is an element for the plaintiffs to establish, but I do not believe plaintiffs' failure to produce direct evidence on the issue

plaintiffs might have been able to produce some evidence about the number of facilities (including hospitals and physicians) which perform abortions and do not advertise the fact, I do not believe the failure to do so is detrimental to their position. First, it would be inconsistent with the *Brown* standard to require plaintiffs to produce the testimony of a physician, clinic or hospital staff member who does not presently advertise who would discontinue providing abortion services if the disclosure provisions were enforced.

Furthermore, defendants' argument that even if all physicians ceased performing in-office abortions, there would be no appreciable effect on a woman's ability to obtain an abortion because physicians provide only 4% of the abortions performed in the Commonwealth must be rejected. Virtually all abortions performed by physicians in their offices are first term abortions for the obvious reason that abortions in later stages of pregnancy are more complicated; in the years 1975 through 1977, of the 3,088 abortions performed in physicians' offices all but eight ($\frac{1}{4}$ of 1%) were performed prior to the 13th week of gestation. As the Court in *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 103 S.Ct. 2481, 2492–93, 76 L.Ed.2d 687 (1983) stressed, even "minor regulations on the abortion procedure during the first trimester may not interfere with physician-patient consultation." Directly or indirectly causing any physician to cease performing abortions is an interference with the physician-patient consultation and restricts the number of facilities performing abortions.

Moreover, disclosure compelled by sections 3207(b) and 3214(f) pertains to information beyond that generally disclosed through advertisement. In addition to the name and address of each facility, the name and address of any parent, subsidiary

or affiliated organizations, corporations or associations, having contemporaneous commonality of ownership, beneficial interest, directorship or officership with any other facility, and information about the total number of abortions performed per quarter as well as the total number of abortions performed per trimester will be revealed. This breadth of information goes far beyond the informational contained in a listing in the yellow pages or an advertisement in a newspaper.

Finally, if the information required by §§ 3207(b) and 3214(f) is available from other sources such as advertising as defendants claim, the Commonwealth cannot justify compelled disclosure even on a rational relation test. If for instance opponents of abortion already know of every facility which performs abortions, the names of any affiliated organizations and the applicable statistical information, public disclosure is rendered useless.

In *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Supreme Court upheld certain recordkeeping requirements noting that "[r]recordkeeping and reporting requirements that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible." The Court specifically relied upon the fact that the records and reports were not be disclosed to the general public: "[t]he added requirements for confidentiality, with the sole exception for public health officers, and for retention for seven years, a period not unreasonable in length, assist and persuade us in our determination of the constitutional limits." *Id.* at 81, 96 S.Ct. at 2846. Unlike the reporting provisions in *Danforth* which imposed no burden on abortion facilities or women seeking abortions and which merely required the facilities to maintain confidential reports

---

of advertisement is detrimental to their case. In fact, I would expect plaintiffs to have the greatest difficulty in presenting evidence as to the effect of disclosure in a case where the probability of harm from disclosure is greatest. If disclosure will not have any adverse conse-

quences, witnesses will readily come forward, but if disclosure will have an undesired or adverse effect, the witnesses will be reluctant to subject themselves to the same public exposure which the disclosure would cause.

which could be inspected by state officials or opened to public health officials for purposes of gathering statistical information, sections 3207(b) and 3214(f) require disclosure of information which adversely impacts upon the physicians who provide the services and imposes a legally significant burden on the right to obtain an abortion.

■ Once it is determined that disclosure would result in a legally significant burden on the fundamental right to obtain an abortion, the burden shifts to the defendants to justify the burden by compelling state interest substantially related to the information to be disclosed. Defendants have proffered several justifications for disclosure which will be examined in *seriatim.*

■ Defendants devote the lion's share of their initial memorandum to arguing that disclosure pursuant to §§ 3207(b) and 3214(f) is justified by the state's compelling interest in facilitating the first amendment rights of those opposed to abortion. Defendants conclude that it is difficult to imagine a state interest of greater magnitude than facilitating the exercise of constitutional rights. I am seriously concerned about the ramifications of the argument defendants are advancing here and for several reasons, I decline to accept it.

The Supreme Court has identified only two state interests which may justify regulation of abortion: protection of potential life and concern over maternal health. *City of Akron,* 103 S.Ct. at 2491–92. Neither of these interests encompasses facilitating the rights of those opposed to abortion.

In support of their contention that aiding citizens in exercising their first amendment rights is a compelling state interest, defendants rely upon *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) in which the Court held that the owner of à large shopping complex could not preclude a particular group from distributing pamphlets and soliciting petition signatures. In *Pruneyard,* however, the Court concluded that

there was no taking of property without just compensation and therefore no infringement of a constitutional right by the state law which promoted and facilitated the exercise of free speech. In this case, I have found that there is an infringement on the constitutional right to obtain an abortion. Moreover, in *Pruneyard,* the Court was considering a statute which provided a forum in which persons could exercise their first amendment rights, *i.e.,* the shopping plaza, whereas the disclosure under consideration here provides the content for the expression or exercise of first amendment rights.

Defendants also contend, relying on *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), that the Commonwealth has a legitimate interest in encouraging protests, demonstrations and the like which have the effect of influencing women to choose childbirth over abortion. In *Harris,* the Court held the Hyde Amendment, which precludes the use of any federal funds to reimburse the costs of abortions under the Medicaid program except in certain specified circumstances, constitutional. In so holding, the Court concluded that even though the effect of the amendment was to favor childbirth over abortion by means of subsidization of one and not the other, the amendment was not unconstitutional because it imposed no governmental restriction on access to abortions. *Harris,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784. *See also Maher v. Roe,* 432 U.S. 464, 475–76, 97 S.Ct. 2376, 2383, 53 L.Ed.2d 484 (1977) (Citing "the basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.") Unlike the passive action in refusing to fund abortion through Medicaid, disclosure, which will increase the likelihood of threats, harassment, and reprisal against women seeking abortions and against physicians and staff members providing them, is an affirmative action by the Commonwealth which interferes with the fundamental right to decide whether or not to have an abortion. Moreover, I am seriously disturbed by the Commonwealth's

reasoning that it can support or foster one point of view when to do so will be to interfere with another group's constitutional rights.

Defendants also contend that the line of cases in which the Supreme Court has held that disclosure is permissible to further the government's interest in deterring illicit activities apply in this case. Relying on *Communist Party v. Subversive Activities Control Board*, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1960), defendants argue that the Commonwealth has a compelling interest in exposing to public view associations which, by their concealment, risk the enlistment of unknowing support.[1] In *Communist Party*, the Court was concerned with people involuntarily assisting an organization involved in foreign-directed conspiracy which posed a potential threat to national security. A fundamental flaw with defendants' reliance on these cases is the implication that abortion itself is an illicit activity which of course it is not.

Defendants endeavor to overcome this flaw by arguing that the illicit activity is the activity of shoddy practitioners. While I am mindful that I must not substitute my judgment for that of the legislature, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 469, 101 S.Ct. 715, 726, 66 L.Ed.2d 659 (1981) and I recognize the Commonwealth's concern about shoddy practitioners, I have been presented with no evidence to convince me that the disclosure of the information required by §§ 3207(b) and 3214(f) will deter or reveal shoddy practitioners. Moreover, that this disclosure will have the desired result does not follow so logically from the requirements that the Commonwealth is relieved of its obligation to provide supporting evidence.[5] *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976). The information required pertains only to parent, subsidiary and affiliated organizations and the number of abortions performed; it will reveal nothing about the quality of the service provided. If it becomes apparent that a particular facility or physician is providing services of below average quality, the Commonwealth will have available to it the name and address of any parent, subsidiary or affiliated organizations and will be able to track the "shoddy practitioner" behind the corporate veil. This should be sufficient to further the Commonwealth's intest in deterring shoddy practitioners. Moreover, the Commonwealth's interest is served by the enforcement of medical licensing statutes which do not require public disclosure of the names and addresses of abortion facilities.

The final interest the Commonwealth proffers to justify the disclosure requirements is the need for accurate detailed statistical information. While this interest is tangentially related to the identi-

---

4. The Commonwealth's interest in exposing to public view associations which by their concealment may run the risk the enlistment of public support is set forth in 18 Pa.Cons.Stat.Ann. § 3202(d) which states:

(d) Right of conscience.—It is the further public policy of the Commonwealth of Pennsylvania to respect and protect the right of conscience of all persons who refuse to obtain, receive, subsidize, accept or provide abortions including those persons who are engaged in the delivery of medical services and medical care whether acting individually, corporately or in association with other persons, and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability or financial burden upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in re-

fusing to obtain, receive, subsidize, accept or provide abortions.

5. Addressing the issue of the disclosure requirement of § 3207(b), the Third Circuit held "[s]ince there has been no showing of any effect of the disclosure on the abortion decision, and the state has proffered the important justification that the provision will help insure that shoddy practitioners may not hide behind the corporate veil, we reject appellants' challenge." *American College*, 737 F.2d at 298. It is important to note that the court did not find that the concern about shoddy practitioners was a compelling state interest substantially related to disclosure. The court had no need to apply this test because the plaintiffs had not yet "demonstrated a nexus between the disclosure of such information and the chilling of constitutional rights." *Id.*

fied interest in protecting maternal health and potential life, it does not rise to the level of a compelling interest sufficiently related to disclosure to justify disclosure.[6] If state policy-makers or courts need access to this information, the Commonwealth can provide it without making it generally available to the public. Moreover, the Department of Health has recognized that it has no need to match the identity of the facility with its statistical report. Plaintiffs' Exhibit 7. It follows, therefore, that there is no compelling state interest justifying disclosing the information in this form to the general public.

*Irreparable Harm*

■ Once plaintiffs have shown a likelihood of success on the merits by showing the likelihood of an unconstitutional infringement on the right to obtain an abortion, the irreparable harm *pendente lite* requirement is satisfied. Because plaintiffs have established for purposes of a preliminary injunction that disclosure pursuant to §§ 3207(b) and 3214(f) will impose a legally significant burden on the right of a woman to obtain an abortion, they have met the irreparable injury requirement.

Another factor in considering whether to issue a preliminary injunction is the rights of the non-moving party. Because plaintiffs have demonstrated a likelihood of success on the merits, the rights of the non-moving party are overcome by the possibility of irreparable harm to a fundamental constitutional right. In addition to the rights of the non-moving party, I have considered the public interest. Because the public has an interest in both the fundamental individual rights and the legislative process, public interest favors a resolution consistent with my decision on the likelihood of success.

## CONCLUSIONS OF LAW

Accordingly, I make the following conclusions of law:

---

**6.** It is important to emphasize that plaintiffs are not contesting the reporting provisions of §§ 3207(b) and 3214(f). Rather, their challenge

1. The jurisdiction of this court is properly invoked.

2. Plaintiffs have established a reasonable probability that they will prevail on the merits.

3. Plaintiffs have established that they will suffer immediate irreparable injury if the preliminary injunction is not granted.

4. There is neither public interest nor a threat of irreparable injury to another interested party which is sufficient to defeat plaintiffs' request for preliminary relief.

---

is restricted to the disclosure requirements of these two provisions.