[No. S031721. May 26, 1994.]

PLANNED PARENTHOOD SHASTA-DIABLO, INC., Plaintiff and Respondent, v.
CHRISTINE WILLIAMS et al., Defendants and Appellants.

864

---

## COUNSEL

John R. Streett for Defendants and Appellants.

James Joseph Lynch, Jr., Jay Alan Sekulow, Walter M. Weber, Thomas P. Monaghan, Christopher R. Inama and Craig Peter T. S. Cornell as Amici Curiae on behalf of Defendants and Appellants.

McCutchen, Doyle, Brown & Enersen Maria P. Rivera, Geoffrey L. Robinson, Grant Guerra and Stephen Mostka for Plaintiff and Respondent.

Catherine I. Hanson, Alice P. Mead, Celeste Lacy Davis, Morrison & Foerster, James J. Garrett, Gregory P. Dresser, Elizabeth Bader, Jill Schlictmann, Melanie Wyne and Elizabeth Dahl as Amici Curiae on behalf of Plaintiff and Respondent.

---

## OPINION

ARABIAN, J.—We are confronted in this matter with a collision between competing constitutional interests involving a subject of exceptional public concern. The precise question is whether, in granting and upholding a permanent injunction against anti-abortion protesters, the trial court and Court of Appeal properly balanced the free speech and assembly rights of the protesters, against the health and safety interests of women attempting to obtain medical services, including clinical abortions, in a private medical facility. We conclude that the injunction, as modified by the Court of Appeal, is constitutional and therefore shall affirm the judgment.

## I. Facts

Viewed independently to determine whether the evidence supports the judgment (*Bose Co.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 498-511 [80 L.Ed.2d 502, 514-524, 104 S.Ct. 1949]), the record discloses the following:[1]

Planned Parenthood is a nonprofit corporation operating a family planning clinic in Vallejo. The clinic provides a range of family planning, health and counseling services, including abortions. Located in a one-story building that it shares with another commercial tenant, a tax service, the clinic adjoins a parking lot located on one side and to the rear of the building. There is a concrete yard for additional parking immediately in the front, and a narrow public sidewalk between the yard and the street. The sidewalk is punctuated by two driveway entrances.

Solano Citizens For Life, under the direction of Christine Williams (hereafter petitioners), is an organization opposed to abortion. Beginning in March 1990, petitioners and others began gathering at the clinic, primarily on Thursdays when abortions were performed, to demonstrate against abortion. Although their numbers varied, there were usually six to eight demonstrators at any given time, and occasionally as many as one hundred. The protesters frequently brought their children as well, ranging in age from infants to teens.

Petitioners picketed on the sidewalk in front of the clinic as well as in the parking lot, carrying signs condemning abortion. One of the tactics of the sidewalk picketers was to walk slowly across the driveway entrance, thereby delaying cars attempting to turn into the lot. As the cars drove in, the protesters would approach and surround the car, attempting to pass literature through the windows even as they were being rolled up. Others pursued patients walking from their cars to the clinic entrance, as well as along the

---

[1]*Bose* held that in cases involving the constitutional rule of *New York Times Co.* (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]) facts pertinent to the critical question of actual malice must be independently reviewed. (*Bose, supra,* 466 U.S. at pp. 505-514 [80 L.Ed.2d at pp. 519-525]; see also *McCoy* v. *Hearst Corp.* (1986) 42 Cal.3d 835, 842 [231 Cal.Rptr. 518, 727 P.2d 711].) It is unclear whether appellate courts have a duty to review de novo all facts relevant to the application of First Amendment principles in all cases involving time, place and manner restrictions. (See *Renton* v. *Playtime Theatres, Inc.* (1986) 475 U.S. 41, 53, fn. 3 [89 L.Ed.2d 29, 42, 106 S.Ct. 925]; *Don's Porta Signs, Inc.* v. *City of Clearwater, Florida* (11th Cir. 1987) 829 F.2d 1051 (cert. denied (1988) 485 U.S. 981 [99 L.Ed.2d 491, 108 S.Ct. 1280] (White, J., dis.)).) We need not resolve this question, however, since we determine that, under any standard, the trial court's findings should not be disturbed.

sidewalk and across the street to the bus stop, offering "sidewalk counseling." "Counseling" consisted of pressing anti-abortion literature and plastic replicas of fetuses on patients attempting to enter the clinic and exhorting them to reconsider their decision to have an abortion. Petitioners also stationed several "counselors" directly outside of the clinic entrance for the same purpose.

The anti-abortion protesters also targeted clinic staff, on at least one occasion calling a clinic nurse a "murderess" and admonishing her not to "kill" babies. They also photographed clinic staff and patients and recorded the license numbers of cars entering the lot.

Petitioner's activities created emotional distress and anxiety in the clinics patients. As a result the clinic began to utilize volunteer escorts to accompany patients entering and leaving the building. In one instance the escorts dispersed a group of protesters encircling an emotionally distraught patient on the sidewalk.

## II. PROCEDURAL HISTORY

In August 1990, Planned Parenthood filed the instant action for a temporary restraining order and preliminary and permanent injunction. The trial court issued a temporary restraining order that enjoined petitioners from harassing any person entering or leaving the clinic and restricted their picketing to the sidewalk in front of the building. After a subsequent hearing, the trial court granted a preliminary injunction restricting to four the number of pickets that petitioners could maintain on the sidewalk in front of the clinic, and requiring that at least two of the pickets remain a minimum of ten feet from the other two.

Trial on the complaint for a permanent injunction was held in April 1991. Witnesses for both the clinic and petitioners described the protest activities at the clinic and their impact on patients and staff. There was also testimony that police enforcement of the terms of the preliminary injunction had been necessary.[2]

Following trial, the court made findings that petitioners had: (1) confronted and intimidated women seeking the clinic's services and forced

---

[2]The dissent's suggestion that there were no problems with enforcing the preliminary injunction is incorrect. One witness, Janice Schoenfeld, testified at the hearing on the permanent injunction that the demonstrators "followed the injunction usually, *except for picketers.*" The picketers are precisely the sidewalk protesters at issue here, and they are clearly the ones who were apparently *not* obeying the preliminary injunction. Furthermore, Marsha Anderson, the clinic director, also testified that she had been compelled to "call[ ] the police to issue the injunction a couple of times, to hand it out to people who were on the

plastic replicas of fetuses and "counseling" upon the clinic's staff and clients; (2) interfered with or obstructed entrance to and exit from the clinic; (3) pursued patients to their cars or public transportation to distribute literature and plastic fetuses; and (4) caused some of the women seeking counseling or services to become emotionally distraught.[3]

Based on these findings, the trial court granted a permanent injunction against petitioners, enjoining them from: (1) blocking any entrance or exit to the clinic building; (2) recording the license numbers of cars entering or leaving the clinic; (3) photographing any person entering or leaving the clinic building; (4) referring, in oral statements while at the clinic site, to physicians, staff or clients as "murdering" or "murderers," "killing" or "killers," or to children or babies being "killed" or "murdered" by anyone in the clinic building in the presence of children under 12; and (5) shouting at or touching physicians, staff or patients entering or leaving the clinic or making noise that could be heard inside the premises. In addition, the injunction restricted all picketing, demonstrating or counseling to the public sidewalk across the street from the clinic building.

On appeal, petitioners challenged those provisions of the injunction that: (1) restricted the content of their speech by preventing them from using specific language in front of children while at the protest site; (2) excluded them from the clinic parking lot; and (3) excluded them from the public sidewalk in front of the clinic building. The Court of Appeal invalidated the content restriction on petitioners' speech, finding that it was not justified by any compelling interest apparent from the record. The Court of Appeal upheld the parking lot exclusion, however, ruling that the clinic was not the functional equivalent of a public forum under *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341], and that petitioners were not, therefore, entitled to exercise their free speech rights on

sidewalk and were about to break the rules." The dissent suggests that Ms. Anderson was referring to the temporary restraining order. On the contrary, the context of her statement, and her reference to issuance of the "injunction," makes it reasonably clear that she is referring to the preliminary injunction. The distinction is practically irrelevant in any event. The preliminary injunction issued a mere one month after the temporary restraining order. It seems unlikely that the witness was referring exclusively to events occurring during that one month interval. Rather, she is clearly referring to events subsequent to the issuance of the temporary restraining order and preliminary injunction, but prior to the hearing on the permanent injunction.

[3]The court also found that petitioners had recorded the license plate numbers of clinic staff and patients and photographed them; that petitioners had called staff "murderers" and asked them not to "kill babies"; that the clinic had to escort its patients through picket lines and "picket/counselors" in the parking lot; and that petitioners had conducted these activities on a weekly basis with as many as 100 people involved.

clinic property. The court also sustained the sidewalk restriction, concluding that it served a substantial governmental interest in safeguarding a woman's right to procreative choice under article I, section 1, of the California Constitution, and was narrowly tailored to serve that interest.[4]

Petitioners sought review solely on the issue of the sidewalk exclusion. We granted the petition to consider that aspect of the injunction.

## III. DISCUSSION

We recognize at the outset the intense moral, religious and political concerns associated with the underlying subject matter of this lawsuit. We are constrained, however, to focus on the legal issue presented. The sole legal question, as noted, is whether the injunction provision that effectively bars petitioners from the public sidewalk in front of the clinic by requiring that all picketing, demonstrating or counseling take place on the public sidewalk directly across the street, violates petitioners' First Amendment rights. To answer this question we apply a familiar framework of analysis.

### A. *Regulation of Speech in a Public Forum*

 The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble . . . ." (U.S. Const., 1st Amend.) These rights are safeguarded against state interference by the due process clause of the Fourteenth Amendment. (*De Jonge* v. *Oregon* (1937) 299 U.S. 353, 364 [81 L.Ed. 278, 283-284, 57 S.Ct. 255].) Furthermore, it is settled that when, as here, the judicial process is invoked to restrict expressive activities on public property, "state action" is implicated entitling the aggrieved party to the protection of the First and Fourteenth Amendments. (*A. F. of L.* v. *Swing* (1941) 312 U.S. 321 [85 L.Ed. 855, 61 S.Ct. 568]; *Bakery Drivers Local* v. *Wohl* (1942) 315 U.S. 769 [86 L.Ed. 1178, 62 S.Ct. 816]; *Hudgens* v. *NLRB* (1976) 424 U.S. 507, 519-521 [47 L.Ed.2d 196, 206-208, 96 S.Ct. 1029]; *Feminist Women's Health Center* v. *Blythe* (1993) 17 Cal.App.4th 1543, 1561 [22 Cal.Rptr.2d 184]; *Bering* v. *Share* (1986) 106 Wn.2d 212 [721 P.2d 918, 925]; see also *Shelley* v. *Kraemer* (1948) 334 U.S. 1, 17 [92 L.Ed. 1161, 1182-1183, 68 S.Ct. 836, 3 A.L.R.2d 441].)

---

[4]The Court of Appeal also held that the sidewalk restriction served a substantial governmental interest in keeping the public street and sidewalk· unimpeded for the free flow of vehicle and pedestrian traffic (*Cameron* v. *Johnson* (1968) 390 U.S. 611, 622 [20 L.Ed.2d 182, 191, 88 S.Ct. 1335]), but concluded that the restriction was not narrowly tailored to further that end.

 It is equally undisputed that peaceful picketing and leafletting constitute expressive "speech" activities at the core of the First Amendment. (*United States* v. *Grace* (1983) 461 U.S. 171, 176-177 [75 L.Ed.2d 736, 742-744, 103 S.Ct. 1702]; *Frisby* v. *Schultz* (1988) 487 U.S. 474, 479 [101 L.Ed.2d 420, 428, 108 S.Ct. 2495].) When these activities occur in "public forums" historically associated with free expression, such as public streets and sidewalks, the right of the state to limit the expressive conduct is sharply circumscribed. (*Perry Ed. Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37, 44-45 [74 L.Ed.2d 794, 803-805, 103 S.Ct. 948]; *Hague* v. *CIO* (1939) 307 U.S. 496, 515 [83 L.Ed. 1423, 1436-1437, 59 S.Ct. 954].)

 Nevertheless, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." (*Heffron* v. *Int'l Soc'y for Krishna Consc.* (1981) 452 U.S. 640, 647 [69 L.Ed.2d 298, 306, 101 S.Ct. 2559].) "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' " (*Ward* v. *Rock Against Racism* (1989) 491 U.S. 781, 791 [105 L.Ed.2d 661, 675, 109 S.Ct. 2746], quoting *Clark* v. *Community for Creative Non-Violence* (1984) 468 U.S. 288, 293 [82 L.Ed.2d 221, 226-227, 104 S.Ct. 3065].)

 Here it is undisputed that the public sidewalk directly in front of the clinic from which petitioners are barred constitutes a public forum. Thus, we must determine whether the place restriction is content neutral, narrowly tailored to serve a significant governmental interest, and permits ample alternative channels of communication. (*Frisby* v. *Schultz, supra*, 487 U.S. at pp. 480-481 [101 L.Ed.2d at pp. 428-430]; *Perry Ed. Assn.* v. *Perry Local Educators' Assn., supra*, 460 U.S. at p. 45 [74 L.Ed.2d at pp. 804-805].)

B. *Content Neutral*

The United States Supreme Court has defined content neutral speech regulations as those that regulate "without reference to the content of the regulated speech." (*Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 771 [48 L.Ed.2d 346, 363-364, 96 S.Ct. 1817].) The injunction at issue here makes no reference whatsoever to the content of petitioners' speech; it merely provides that all picketing, demonstrating or counseling shall take place on the public sidewalk across the street from the clinic. No speech of any "particular content" is "singled out" for better or worse

treatment by the government. (*Ibid.*) Thus, the place restriction is clearly content neutral.

Petitioners strenuously assert otherwise, noting that the injunction was impelled by their anti-abortion protests and applies only to such activities. Obviously the injunction at issue here is confined to petitioners, and properly so; they were the only ones found to have harassed clinic patients and staff. (See *Northeast Women's Center, Inc.* v. *McMonagle* (3d Cir. 1991) 939 F.2d 57, 63 [restriction on anti-abortion protest activities within 500 feet of a women's health clinic properly "applies only to [defendants], but that is because it is only those persons who the Center has proved have created and are continuing to create a threat of violence and intimidation"]; *Pro-Choice Network* v. *Project Rescue* (W.D.N.Y. 1992) 799 F.Supp. 1417, 1433 ["It is true that the injunction applies only to the defendants, but that is because it is only the defendants who have created a threat of harassment and intimidation."].) A restriction that enjoined all picketers in addition to petitioners would clearly have been overbroad. (See *Thornhill* v. *Alabama* (1940) 310 U.S. 88, 97-98 [84 L.Ed. 1093, 1099-1100, 60 S.Ct. 736]; *Bering* v. *Share, supra,* 721 P.2d at pp. 925-926.)

■ Furthermore, as the United States Supreme Court has explained: "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on *some* speakers or messages but not *others.*" (*Ward* v. *Rock Against Racism, supra,* 491 U.S. at p. 791 [105 L.Ed.2d at p. 675], italics added.) Thus, the vast majority of courts that have considered the issue have upheld time, place and manner restrictions on anti-abortion protesters against challenges that they improperly "single out" such demonstrators or their message. (See, e.g., *Feminist Women's Health Center* v. *Blythe, supra,* 17 Cal.App.4th at p. 1559 ["the locational restriction on defendants' activity was not based on the content of their speech but on the conduct involved, i.e., the obstruction of ingress and egress by physical blocking and harassment, and on the risk of harm to the clinic's patients"]; *Bering* v. *Share, supra,* 721 P.2d at p. 925 [injunctive restrictions on anti-abortion protesters "are not related to the content of [the] picketers' speech, but rather to the way in which they conducted themselves at the picket site"]; *Fargo Women's Health* v. *Lambs of Christ* (N.D. 1992) 488 N.W.2d 401, 408 ["When an injunction is based on a record of force, trespass and intimidation, the justification for the injunction is the method of communicating, not the motivating idea."]; *Northeast Women's Center, Inc.* v. *McMonagle, supra,* 939 F.2d at p. 63 ["The injunction at issue here is content-neutral. . . . The challenged sections of the injunction make no mention whatsoever of abortion or any other substantive issue—they merely

restrict the volume, location, timing, and violent or intimidating nature of [defendants'] expressive activity."]; *N.Y. State Nat. Organization for Women v. Terry* (2d Cir. 1989) 886 F.2d 1339, 1363 ["The message—that abortion is wrong, immoral, and must be stopped—is not singled out for unfavorable treatment. The injunction is not a ban, nor is it a ban masquerading as a limitation."]; *Portland Fem. Women's H. Ctr.* v. *Advocates for Life* (9th Cir. 1988) 859 F.2d 681, 686 [Limitation on anti-abortion protests "is not a content-based restriction of expression. . . . Rather, it focuses exclusively on the location and manner of expression."]; *Pro-Choice Network* v. *Project Rescue, supra,* 799 F.Supp. at p. 1433 [Injunction limiting pro-life protest activities "is content-neutral . . . . It regulates when, where and how defendants may speak, but not what they may say."]; but cf. *Cheffer* v. *McGregor* (11th Cir. 1993) 6 F.3d 705, 710-711; *Thomason* v. *Jernigan* (E.D.Mich. 1991) 770 F.Supp. 1195, 1201.)

■ As noted earlier, the place restriction at issue here makes no reference to petitioners' particular viewpoint or even to the general subject matter of their demonstrations; it focuses exclusively on the *manner* and *location* of their expressive activities, effectively insulating the clinic's patients and staff from close physical contact with petitioners—*not* from the content of their speech. (See *Portland Fem. Women's H. Center* v. *Advocates for Life, supra,* 859 F.2d at p. 686.) Indeed, a similar injunction might just as readily apply to pro-choice demonstrations or to any other disruptive protest in close physical proximity to the clinic. Thus, we conclude that the injunction satisfies the threshold test of content neutrality.

For similar reasons, petitioners' claim that the injunction operates as an unconstitutional "prior restraint" on protected speech must fail. ■ A prior restraint is a content-based restriction on speech prior to its occurrence. (*Southeastern Promotions, Ltd.* v. *Conrad* (1975) 420 U.S. 546, 558-559 [43 L.Ed.2d 448, 458-460, 95 S.Ct. 1239]; *Northeast Women's Center, Inc.* v. *McMonagle, supra,* 939 F.2d at p. 63; Tribe, American Constitutional Law (2d ed. 1988) § 12-34, p. 1040.)[5] Valid time, place and manner restrictions which do not functionally prohibit all means of communication are not prior restraints. (See, e.g., *Poulos* v. *New Hampshire* (1953) 345 U.S. 395, 408 [97 L.Ed. 1105, 1115-1116, 73 S.Ct. 760, 30 A.L.R.2d 987]; *Cox* v. *New Hampshire* (1941) 312 U.S. 569, 574-576 [85 L.Ed. 1049, 1052-1054, 61 S.Ct. 762, 133 A.L.R. 1396]; cf. *Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415, 418-419 [29 L.Ed.2d 1, 4-6, 91 S.Ct. 1575].)

[5]The prior restraint doctrine has also been invoked to invalidate procedurally inadequate or overbroad permit requirements. (See, e.g., *National Socialist Party* v. *Skokie* (1977) 432 U.S. 43 [53 L.Ed.2d 96, 97 S.Ct. 2205]; *Staub* v. *City of Baxley* (1958) 355 U.S. 313 [2 L.Ed.2d 302, 78 S.Ct. 277].)

## C. *Significant State Interest*

■ The more difficult question is whether the interests served by the injunction are consonant with its scope. Is the place restriction narrowly tailored to advance significant governmental interests, and does it allow adequate alternative avenues of communication? On balance, we conclude that the place restriction serves a significant governmental interest in safeguarding the health and safety of the clinic's patients, and is narrowly tailored to further that interest. We also conclude that the restriction allows petitioners adequate alternative means of conveying their anti-abortion message.

■ The Supreme Court has recognized that the reasonableness of a time, place or manner restriction depends heavily upon "[t]he nature of a place, 'the pattern of its normal activities. . . .' The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 116 [33 L.Ed.2d 222, 232, 92 S.Ct. 2294].) The high court has applied this principle to uphold regulation of speech activities on public streets and sidewalks in front of schools (*ibid.*), courthouses (*Cox* v. *Louisiana* (1965) 379 U.S. 559 [13 L.Ed.2d 487, 85 S.Ct. 476]) and private residences (*Frisby* v. *Schultz, supra,* 487 U.S. 474). In *Grayned,* the court upheld a limitation on noisy demonstrations near schools during classroom hours, observing that the city had a "compelling interest in having an undisrupted school session conducive to the students' learning . . . ." (408 U.S. at p. 119 [33 L.Ed.2d at p. 234].) In *Cox,* the court sustained a restriction on picketing outside of courthouses, holding that the statute served a significant state interest in protecting "the fair and orderly working of the judicial process." (379 U.S. at p. 565 [13 L.Ed.2d at p. 493].) And, in *Frisby,* the high court upheld a ban on picketing in front of individual residences, ruling that the ordinance furthered a substantial state interest in assuring "residential privacy" and repose. (487 U.S. at p. 484 [101 L.Ed.2d at p. 431].)[6]

■ The principle that sustains the regulation of disruptive expression outside of schools, courthouses and individual residences applies equally, in

---

[6]As *Frisby* also illustrates, the state's interest in safeguarding individual privacy is particularly strong in circumstances where the audience cannot readily avoid the message. Thus, the government may properly protect "captive" listeners from unwanted intrusions into the home (*Frisby* v. *Schultz, supra,* 487 U.S. 474), on city buses (*Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298 [41 L.Ed.2d 770, 94 S.Ct. 2714]), and wherever individuals cannot escape "bombardment of [their] sensibilities." (*Erznoznik* v. *City of Jacksonville* (1975) 422 U.S. 205, 211 [45 L.Ed.2d 125, 132, 95 S.Ct. 2268], quoting *Cohen* v. *California* (1971) 403 U.S. 15, 21 [29 L.Ed.2d 284, 291-292, 91 S.Ct. 1780].) As we discuss below (*post,* at pp. 879-880), the Constitution does not guarantee petitioners the right to create, in effect, a

our view, to permit the regulation of conduct "incompatible" with the health and safety of patients in a medical facility. (*Grayned* v. *City of Rockford, supra*, 408 U.S. at p. 116 [33 L.Ed.2d at p. 232].) Indeed, the United States Supreme Court has explicitly recognized that the government has a significant interest in protecting hospital patients from disturbance. (See *Beth Israel Hospital* v. *NLRB* (1978) 437 U.S. 483 [57 L.Ed.2d 370, 98 S.Ct. 2463] [upholding restrictions on speech designed to shield patients from upsetting speech]; *NLRB* v. *Baptist Hospital, Inc.* (1979) 442 U.S. 773 [61 L.Ed.2d 251, 99 S.Ct. 2598] [*semble*]; see also Note, *Too Close For Comfort: Protesting Outside Medical Facilities* (1988) 101 Harv.L.Rev. 1856, 1862-1866 [hereafter, Note].)[7]

This interest is particularly acute in the context of family planning clinics that perform the most intimate of medical services, including abortions. The constitutional right of privacy that guarantees a woman's freedom to choose an abortion (*Planned Parenthood of Southeastern Pennsylvania* v. *Casey* (1992) 505 U.S. __ [120 L.Ed.2d 674, 112 S.Ct. 2791]; *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]) defines an equally substantial governmental interest in assuring that they are performed in a safe and suitable environment.[8] As the high court has stated, the government "may properly assert *important interests in safeguarding health*" and "in maintaining medical standards" in the performance of abortions. (*Roe* v. *Wade* (1973) 410 U.S. 113, 154 [35 L.Ed.2d 147, 177-178, 93 S.Ct. 705], italics added.) The state has a "legitimate interest in seeing to it that an abortion, like any other medical procedure, is performed under circumstances that *insure maximum safety for the patient.*" (*Id.* at p. 150 [35 L.Ed.2d at p. 175], italics added.)

The state's responsibility for the health and safety of women seeking medical services, including abortions, extends beyond the operating room.

captive audience by cordoning off an area of the sidewalk and allowing no one to pass who did not agree to listen to their message.

[7]As stated in *Beth Israel Hosp.* v. *NLRB, supra*, 437 U.S. 483, "Hospitals, after all, are not factories or mines or assembly plants. They are hospitals, where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sickbed." (*Id.* at p. 509 [57 L.Ed.2d at p. 391] (conc. opn. of Blackmun, J.) and quoted in *NLRB* v. *Baptist Hospital, Inc., supra*, 442 U.S. at pp. 783-784, fn. 12 [61 L.Ed.2d at p. 262].)

[8]We have recently held, moreover, that the privacy rights set forth in article I, section 1 of the California Constitution are protectible not only against governmental intrusion, but against private invasions as well. (*Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633].)

Physical or emotional intimidation of patients outside the doctor's office may significantly affect their course of treatment once they are inside. As one commentator has observed, "Forced [physical] proximity combined with unwanted speech threatens not only patients' repose and autonomy but their health as well." (Note, *supra*, 101 Harv.L.Rev. at pp. 1864-1865, fns. omitted.)

Indeed, emotionally jarring confrontations with anti-abortion pickets or sidewalk "counselors" may pose serious health risks. As one federal district court found: "Women entering and leaving clinics have been verbally harassed; the effect of such harassment has been to increase the level of anxiety a woman feels and to exacerbate any emotional problems associated with the abortion decision and procedure which in turn may have an adverse effect on the medical procedure itself and on the patient's psychological well-being thereafter." (*American C. of Ob. & Gyn., Pa. S. v. Thornburgh* (E.D.Pa. 1985) 613 F.Supp. 656, 666, affd. on other grounds *sub nom. Thornburgh v. American Coll. of Obst. & Gyn.* (1986) 476 U.S. 747 [90 L.Ed.2d 779, 106 S.Ct. 2169].) Another court found that women confronted and harassed by anti-abortion demonstrators before entering the clinic suffered "[i]ncreased stress and anxiety" which could "cause patients to . . . have elevated blood pressure[,] . . . hyperventilate[,] . . . require sedation[,] . . . or require special counseling and attention before they are able to obtain health care." (*Pro-Choice Network v. Project Rescue, supra,* 799 F.Supp. at p. 1427.) Others have noted that patients required to reschedule appointments as a result of stress-induced emotional trauma could face additional risks and complications arising from the delay, e.g., the added risks of a second- rather than a first-trimester abortion. (*Ibid.*; see also *Feminist Women's Health Center v. Blythe, supra,* 17 Cal.App.4th at pp. 1553, 1555; *Planned Parenthood v. Holy Angels Catholic Church* (N.D.Cal. 1991) 765 F.Supp. 617, 620.) Medical staff at family planning clinics have testified before Congress that the psychological stress resulting from aggressive anti-abortion demonstrations has complicated both the medical treatment itself and the patient's subsequent well-being. (Abortion Clinic Violence: Oversight Hearings Before the Subcom. on Civil and Constitutional Rights of the House Com. on the Judiciary, 99th Cong., 1st & 2d Sess. (1987), cited in Note, *supra*, 101 Harv.L.Rev. at pp. 1865-1866.)

In light of this evidence, a considerable number of courts have upheld time, place and manner restrictions designed to temper the confrontational tactics of anti-abortion demonstrators and thereby alleviate the emotional distress and resulting health risks experienced by women entering and leaving family planning clinics. (See, e.g., *Feminist Women's Health Center*

v. *Blythe, supra,* 17 Cal.App.4th at pp. 1553, 1555; *Bering* v. *Share, supra,* 721 P.2d at p. 928; *Right to Life Advo.* v. *Aaron Women's Cl.* (Tex.Ct.App. 1987) 737 S.W.2d 564, 569; *Northeast Women's Center, Inc.* v. *McMonagle, supra,* 939 F.2d at p. 63; *Medlin* v. *Palmer* (5th Cir. 1989) 874 F.2d 1085, 1090; *Portland Fem. Women's H. Ctr.* v. *Advocates for Life, supra,* 859 F.2d at p. 686; *Pro-Choice Network* v. *Project Rescue, supra,* 799 F.Supp. at p. 1427; *Planned Parenthood* v. *Holy Angels Catholic Church, supra,* 765 F.Supp. at p. 620; *American C. of Ob. & Gyn., Pa. S.* v. *Thornburgh, supra,* 613 F.Supp. at p. 666.)

The findings of fact adopted by the trial court here reveal that it was precisely the health and well-being of the clinic's patients that constituted the court's primary concern. The trial court found, inter alia, that petitioners' pickets and counselors had "confront[ed]" and "intimidate[d]" women seeking the clinic's services, "force[d]" plastic fetuses and "counseling" on the clinic's staff and patients, and "pursued" patients to their cars or public transportation in an effort to distribute literature and plastic fetuses. There was testimony that petitioners continued to accost, follow or encircle patients even after they indicated a desire to be left alone; "If the [car] windows were being rolled up, they would attempt to pass literature through the window"; "[one] client was crying and her sister or friend . . . was asking the people to leave her alone"; "[another] was really trying to get away from them"; when one woman refused to take a plastic fetus, they handed it to her small child; on one occasion staff members had to disperse a group of picketers who were surrounding a patient on the sidewalk; women who came to the clinic for services unrelated to abortion were also emotionally upset. Based on this and other evidence the trial court found that petitioners, their pickets and counselors, "caused some of the women seeking counseling or services from [the clinic] to become emotionally distraught."

One of the principal purposes of the trial court's place restriction was thus to constrain petitioners' confrontational tactics and thereby limit the physical intimidation of, and resulting emotional trauma to, the clinic's patients. Added to the stress that normally accompanies any medical treatment, the strain of being pursued and harried by anti-abortion pickets and sidewalk "counselors," however well-meaning, could result in serious medical problems. As mentioned earlier, such emotional distress could lead to inaccurate blood pressure readings or incomplete medical histories, complicate patient counseling, delay treatment, increase health risks, and prolong recovery. (See *Bering* v. *Share, supra,* 721 P.2d at p. 928; *Portland Fem. Women's H. Ctr.* v. *Advocates for Life, supra,* 859 F.2d at p. 683; *Planned Parenthood* v.

*Holy Angels Catholic Church, supra,* 765 F.Supp. at p. 620; *O.B.G.Y.N. Assoc.* v. *Birthright of Brooklyn* (1978) 64 A.D.2d 894 [407 N.Y.S.2d 903, 905-906]; Note, *supra,* 101 Harv.L.Rev. at pp. 1865-1866.)

We conclude, therefore, that the place restriction serves a substantial governmental interest in protecting the patients' physical and emotional health and safety.[9]

### D. *Narrowly Tailored*

■ While the state has a substantial interest in safeguarding the health and safety of its citizens who seek medical services, it must do so by narrowly tailored means which do not "unnecessarily interfer[e] with First Amendment freedoms." (*Schaumburg* v. *Citizens for Better Environ.* (1980) 444 U.S. 620, 637 [63 L.Ed.2d 73, 88, 100 S.Ct. 826].) ■ Accordingly, we must also determine whether the place restriction was narrowly tailored to effectuate the state's interest.

■ In resolving this question, we are mindful of the Supreme Court's admonition that a narrowly tailored remedy is not synonymous with the "least restrictive means" of achieving the desired end. As the high court has explained, "[R]estrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" (*Ward* v. *Rock Against Racism, supra,* 491 U.S. at p. 797 [105 L.Ed.2d at p. 679], quoting *United States* v. *Albertini* (1985) 472 U.S. 675, 689 [86 L.Ed.2d 536, 548-549, 105 S.Ct. 2897].) "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" (491 U.S. at p. 799 [105 L.Ed.2d at p. 680], quoting *United States* v. *Albertini, supra,* 472 U.S. at p. 689 [86 L.Ed.2d at pp. 548-549].) "So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." (491 U.S. at p. 800 [105 L.Ed.2d at p. 681].)

■ In crafting the injunction, it is apparent that the trial court was guided by the paramount need to maintain an atmosphere around the clinic conducive to the health of its patients and its normal medical functions. As

---

[9]In view of our conclusion that the place restriction serves a substantial governmental interest in preserving health and safety, we need not address the holding of the Court of Appeal that the restriction was necessary to safeguard the patients' right, under article I, section 1 of the California Constitution, to procreative choice.

the Supreme Court has stated, "[t]he crucial question [in determining the reasonableness of a time, place or manner restriction] is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." (*Grayned* v. *City of Rockford, supra,* 408 U.S. at p. 116 [33 L.Ed.2d at p. 232].) The threatening and intimidating behavior of petitioners' pickets and "counselors" was plainly inappropriate in the context of a health care facility treating women who are already undergoing the stress normally associated with abortions and other obstetrical or gynecological treatment. Confining the demonstrations to an alternative site across the street from the clinic responded most effectively to this threat by preventing petitioners from crowding patients and invading their "personal space." (*Pro-Choice Network* v. *Project Rescue, supra,* 799 F.Supp. at p. 1434.)

Such "clear zones" have been sanctioned by the United States Supreme Court in a variety of demonstration contexts (see, e.g., *Boos* v. *Barry* (1988) 485 U.S. 312 [99 L.Ed.2d 333, 108 S.Ct. 1157] [sustaining ordinance prohibiting picketing within 500 feet of a foreign embassy]; *Cox* v. *Louisiana, supra,* 379 U.S. 559 [upholding ban on picketing near courthouse]) and, more recently, have been widely employed by state and federal courts in the context of anti-abortion protests. (See, e.g., *Planned Parenthood* v. *Holy Angels Catholic Church, supra,* 765 F.Supp. at pp. 626-627 [court imposed "no-protest" zone within 25 feet of clinic entrance]; *Pro-Choice Network* v. *Project Rescue, supra,* 799 F.Supp. at pp. 1440-1441 [injunction established 15-foot "clear zone" around clinic entrances and people and vehicles seeking access thereto]; *Portland Fem. Women's H. Ctr.* v. *Advocates for Life, supra,* 859 F.2d at p. 686 [court sustained 12-foot "free zone" around clinic entrance]; *Northeast Women's Center, Inc.* v. *McMonagle, supra,* 939 F.2d at pp. 63-64 [court upheld injunction prohibiting all but 6 pickets within 500 feet of clinic]; *Fargo Women's Health* v. *Lambs of Christ, supra,* 488 N.W.2d at pp. 407-408 [court sustained injunction prohibiting more than two protesters within one-hundred-foot "bubble zone" around clinic]; see also Note, *supra,* 101 Harv.L.Rev. at pp. 1872-1874 [concluding that "bubble zone" ordinance establishing a 100-foot buffer-zone around licensed medical facilities represented "the least restrictive means for serving the government's interest."].)

The nature and extent of the injunctions in these cases differ, naturally, depending upon the particular facts and geographic circumstances presented. They all embrace, however, the principle that a "clear zone" or "free zone" around a health clinic that does not foreclose alternative, albeit less confrontational, means of communication present a narrowly tailored scheme for

furthering the state's substantial interest in assuring the health and safety of women seeking abortions or other treatment. Nowhere is this principle more clearly stated than the widely cited decision in *Bering* v. *Share, supra,* 721 P.2d 918. There, the Washington Supreme Court upheld a geographical restriction strikingly similar to the one at issue here. Concerned that the confrontational nature of anti-abortion pickets and sidewalk "counselors" had created a "substantial risk" of harm to clinic patients, the trial court confined the protesters to the public sidewalk directly to the north and around the corner from the clinic entrance. (*Id.* at p. 925.) The Washington Supreme Court sustained the injunction, observing that a clear zone "away from the building's entrance and the sidewalk fronting the building" was necessary "to mitigate the severe emotional impact otherwise experienced by many patients, especially women who are visiting the Medical Building for abortion-related services." (*Id.* at p. 929.) The place restriction was justified, the court concluded, to relieve the clinic's patients from the trauma of navigating "a gauntlet of placard-carrying" protesters and was narrowly drawn to accomplish that interest. (*Id.* at p. 930; see also *Thompson* v. *Police Dept. of City of New York* (1989) 145 Misc.2d 417 [546 N.Y.S.2d 945] [police may properly erect barricade preventing anti-abortion "counselors" from moving along public sidewalk in front of women's health clinic and speaking directly to patients]; *People* v. *Maher* (1987) 137 Misc.2d 162 [520 N.Y.S.2d 309] [*semble*].)

Thus, in the light of the record and consistent with case law across the country, we conclude that the place restriction was narrowly tailored to effectuate a substantial state interest.

Petitioners and the various amici curiae in support thereof contend, nevertheless, that the injunction was not narrowly tailored to the circumstances because patients were not physically harmed, because the restriction exceeds that necessary to secure access to the clinic, and because less restrictive means, such as a narrower zone or a limit on the number of protesters, were available to ensure patient safety. The absence of physical assaults, however, is not dispositive. The state's interest was to alleviate the hazardous medical environment created by the intimidating presence of protesters in close proximity to patients. Similarly, merely keeping the sidewalks free for passage does not address the problem identified by the trial court of protesters hounding and upsetting unwilling listeners. Nor would restricting the number of pickets and counselors in front of the clinic necessarily mitigate the emotional impact on women forced to navigate even a limited number of

pickets and sidewalk "counselors."[10] And while it is always possible that the trial court might have devised a geographical restriction a few feet closer to the clinic than the sidewalk across the street, that is not the litmus test of constitutional validity. As noted earlier, so long as "the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." (*Ward* v. *Rock Against Racism, supra,* 491 U.S. at p. 800 [105 L.Ed.2d at p. 681].) Our mandate, in short, does not encompass "quibbling over a few feet." (*Portland Fem. Women's H. Ctr.* v. *Advocates for Life, supra,* 859 F.2d at p. 686.) Although plainly not petitioners' ideal vantage point, the location across the street offers a reasonably precise and narrowly tailored means of accomplishing the state's interest.

The several cases on which petitioners rely do not suggest otherwise. In *Mississippi Women's Medical Clinic* v. *McMillan* (5th Cir. 1989) 866 F.2d 788, a women's health clinic applied for a preliminary injunction to restrain anti-abortion protesters solely on the ground that their patients' right to *choose* an abortion had been made more difficult by the protests. The federal district court denied the injunction and the court of appeals affirmed, noting the absence of any evidence that patients had been physically restrained or intimidated from entering the clinic and exercising their constitutional right to an abortion. (*Id.* at pp. 795-796.) The interest which we find to be pertinent here is not a woman's right to choose an abortion, but rather her right to have an abortion and other medical and family planning services in a safe and suitable environment.

Nor do *Planned Parenthood* v. *Wilson* (1991) 234 Cal.App.3d 1662 [286 Cal.Rptr. 427] and *Allred* v. *Shawley* (1991) 232 Cal.App.3d 1489 [284

---

[10]At oral argument it was noted that the practice of limiting the number of pickets is often utilized in the context of labor disputes. Counsel for petitioners rejected this expedient as unduly violative of petitioners' First Amendment rights. We consider the instant case to be distinguishable in any event. In the typical labor dispute, the governmental interest centers on maintaining free passage in public areas or guaranteeing access to the target premises; generally, these goals may be effectively attained by limiting the number of pickets. Here, in contrast, the critical issue was not access, but health and safety. In these unique circumstances, the trial court was eminently justified in concluding that the protesters' proven confrontational tactics posed an intolerable threat to the emotional health and safety of the patients, whether those tactics were resorted to by two or twenty. That the trial court had limited the number of protesters on the sidewalk in its preliminary injunction does not in any way undermine its subsequent judgment. A preliminary injunction is not a determination of the ultimate rights in controversy, but simply a provisional remedy pending a trial on the merits. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889]; *Socialist Workers etc. Committee* v. *Brown* (1975) 53 Cal.App.3d 879, 887-888 [125 Cal.Rptr. 915].) Substantial evidence from the hearing on the permanent injunction established that the state's interest in protecting the patients required the preclusion of face-to-face, physical confrontations with the protesters.

Cal.Rptr. 140] undermine our conclusion. These decisions deal exclusively with the propriety of an injunction barring anti-abortion protesters from private property. In each case, the Court of Appeal rejected the protesters' claim that a family planning clinic was the functional equivalent of a public forum, thus distinguishing our decision in *Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899. (*Planned Parenthood* v. *Wilson, supra,* 234 Cal.App.3d at pp. 1671-1672; *Allred* v. *Shawley, supra,* 232 Cal.App.3d at pp. 1495-1505.) That issue, as noted earlier, is not presented here. Nor, finally, does *Chico Feminist Women's Health Center* v. *Scully* (1989) 208 Cal.App.3d 230 [256 Cal.Rptr. 194] support petitioners' cause. There the clinic moved for an injunction to exclude anti-abortion pickets from "any vantage," including streets and sidewalks, from which patients "can be identified." (*Id.* at p. 235.) The Court of Appeal ruled that the patients' privacy interest did not encompass a concomitant right to anonymity such as would justify the broad injunction sought. (*Id.* at pp. 240-243.) Here, however, the threat is not mere recognition, but emotional and physical health. The two cases are plainly distinguishable.

### E. *Adequate Alternatives*

Lastly, petitioners contend that the place restriction denies them adequate alternative avenues of communication. They do not contend, however, that their picket signs cannot be seen, or that their presence and views cannot readily be perceived by clinic staff and patients. Rather, their principal complaint is that they will not be able physically to confront or "counsel" unwilling listeners because patients and staff will not be compelled to pass close to the demonstrators to enter the clinic. The objection is unavailing.

The First Amendment does not give petitioners the right to a captive audience, but simply "the opportunity to win the attention of pass-ersby and engage them in conversation if the latter so desire." (*Bering* v. *Share, supra,* 721 P.2d at p. 930; see *Heffron* v. *Int'l Soc'y for Krishna Consc., supra,* 452 U.S. at p. 655 [69 L.Ed.2d at p. 311] ["The First Amendment protects the right of every citizen to 'reach the minds of willing listeners and to do so there must be opportunity to win their attention.' "].) As the United States Supreme Court has stated, "A group of demonstrators could not insist upon the right to cordon off a street or entrance to a public or private building and allow no one to pass who did not agree to listen to their exhortations." (*Cox* v. *Louisiana* (1965) 379 U.S. 536, 555 [13 L.Ed.2d 471, 484, 85 S.Ct. 453])

The alternative site across the street from the clinic affords petitioners a vantage from which to picket and demonstrate that is reasonably

close to the clinic and, judging from the photographic exhibits in the record, within plain view of their target audience, the clinic patients and staff. As noted above, petitioners do not contend that their signs cannot be seen or that their presence and views cannot readily be perceived by persons entering and leaving the clinic. Should anyone wish to be "counseled" by or otherwise converse with petitioners, it is a short walk across the street. (See *Bering* v. *Share, supra,* 721 P.2d at p. 931.) Accordingly, we conclude that the injunction leaves petitioners ample alternative avenues of communication.

## CONCLUSION

We are charged in this matter with resolving a conflict arising from perhaps the most difficult and divisive subject of our day. Our resolution of this clash of interests is bound to satisfy neither party completely. Any limitation on petitioners' speech activities less comprehensive than a total exclusion from the area will assuredly result in some distress to patients and disruption of the clinic's normal operations. Yet any restriction on those activities, of any scope or nature, will undoubtedly be perceived by petitioners as inconsistent with their sense of moral duty.

With that understanding, we have cautiously reviewed the litigants' claims of encroachment on their respective rights and interests. As the end of the law is peace, we have sought a resolution that confers neither undue advantage nor unfair hardship on either adversary. Indeed, our object has been to narrow as much as possible the accretion of power to one at the expense of the other.

Our review of the evidence and the legal precedents confirm that the restriction fashioned by the trial court was consistent with these ends. In affirming that judgment, we endorse a result that is manifestly reasonable and conducive to the fostering of greater harmony in the community.

Accordingly, the judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., Baxter, J., George, J., and Strankman, J.,* concurred.

**BAXTER, J.,** Concurring.—Today's decision will probably receive a fair amount of publicity. Groups on either side of the abortion debate may hail it as a political victory or defeat. In legal circles, it will be cited as support for

*Presiding Justice, Court of Appeal, First Appellate District, Division One, assigned by the Acting Chairperson of the Judicial Council.

erecting "buffer zones" around family planning clinics besieged by protestors. (See *Operation Rescue* v. *Women's Health Center* (Fla. 1993) 626 So.2d 664, cert. granted Jan. 21, 1994, *sub nom. Madsen* v. *Women's Health Center, Inc.* __ U.S. __ [127 L.Ed.2d 98, 114 S.Ct. 907].)

But abortion is not the central issue in this case. The free-speech problems presented could arise in any context. At issue is the extent to which the First Amendment's protection of political expression is limited by the rights of private citizens to conduct their lawful business without pain or hindrance.

In our society, all presumptions are in favor of unfettered expression, particularly where the forum is public and an issue of broad concern is involved. The First Amendment protects vigorous, even stinging, debate. The burden generally falls on the recipients of an unwanted message to turn away. (See *Frisby* v. *Schultz* (1988) 487 U.S. 474, 479-481 [101 L.Ed.2d 420, 428-430, 108 S.Ct. 2495]; *Boos* v. *Barry* (1988) 485 U.S. 312, 318 [99 L.Ed.2d 333, 342-353, 108 S.Ct. 1157]; *Erznoznik* v. *City of Jacksonville* (1975) 422 U.S. 205, 208-211 [45 L.Ed.2d 125, 130-132, 95 S.Ct. 2268]; *Cohen* v. *California* (1971) 403 U.S. 15, 20-26 [29 L.Ed.2d 284, 291-295, 91 S.Ct. 1780].)

The question remains, however, whether the same protection applies where the speaker seeks to engage in face-to-face confrontations with individual members of a targeted audience, and where the risk of intimidation, humiliation, or violence is high. What if such tactics are calculated to coerce unwilling targets into a particular course of conduct whether or not they are persuaded by the message the speaker seeks to convey? These issues assume special significance in a media-savvy age, where news coverage may serve as an additional incentive for staging a violent protest.

Such tactics do not necessarily fall within the aegis of the First Amendment. Disruptive conduct need not be tolerated simply because it has a symbolic component or facilitates speech. (*United States* v. *O'Brien* (1968) 391 U.S. 367, 376 [20 L.Ed.2d 672, 679-680, 88 S.Ct. 1673].) No individual is expected to endure "fighting words" and vicious personal attacks (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 309-310 [84 L.Ed. 1213, 1220-1221, 60 S.Ct. 900, 128 A.L.R. 1352]), or to experience hardship or a significant loss of privacy as a result of another's "free" speech. (*Frisby* v. *Schultz, supra,* 487 U.S. 474, 484-487 [101 L.Ed.2d 420, 431-434]; *Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298, 302-304 [41 L.Ed.2d 770, 776-778, 779-780, 94 S.Ct. 2714] (plur. opn. by Blackmun, J.), 306-308 (conc. opn. of Douglas, J.).)

Like the parties and lower courts, the majority applies the rigorous test for evaluating time, place, and manner restrictions on speech in a "public forum." Such an approach assumes that all protest activities leading up to and affected by the trial court's injunction constitute "protected speech" under the First Amendment. (*Frisby* v. *Schultz, supra,* 487 U.S. 474, 479 [101 L.Ed.2d 420, 428].) I agree that the injunction is entirely sustainable under this test, but I am not certain such solicitude is warranted. In my view, some of the more confrontational activities prompting the "buffer zone" injunction crossed the line from protected expression to unprotected interference with the lawful activities of other citizens. For that additional reason, I conclude the "buffer zone" imposed by the trial court was proper.

George, J., concurred.

**KENNARD, J.**—I respectfully dissent.

The federal Constitution protects both a woman's right to obtain an abortion during the early months of pregnancy and the right of every person to publicly and peacefully express an opinion on emotionally charged and controversial issues like abortion. When presented with a case like this one, in which these constitutional rights appear to collide, a court must take special care to ensure that both rights are effectively protected, so far as reasonably possible.

In this case, a medical clinic that was the subject of anti-abortion demonstrations asked a court for an injunction to protect itself and its clients. The trial court issued preliminary orders permitting only a small number of protesters on the sidewalk in front of the clinic. Eleven months later, it issued a permanent injunction prohibiting *any* protesters on that sidewalk, even though the clinic had not sought such a blanket prohibition. We granted review solely to consider the validity of the sidewalk exclusion. The majority concludes that the exclusion was proper. I cannot agree.

My disagreement is not with the majority's descriptions of the pertinent law or the relevant interests at stake. Rather, I disagree with the majority's account of the operative facts and the conclusion it reaches by applying the law to those facts. Relying on fragmentary and equivocal testimony, the majority derives from the trial court record a factual picture that is incomplete and misleading. As I will explain, the record supports the trial court's decision to establish a buffer zone around the clinic, but not its absolute prohibition of speech within that zone.

I. STANDARD OF REVIEW

When it reviews an order restricting First Amendment rights, an appellate court must " 'make an independent examination of the whole record' . . . to

make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " (*Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 499 [80 L.Ed.2d 502, 515-516, 104 S.Ct. 1949], quoting *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 284-286 [11 L.Ed.2d 686, 708-710, 84 S.Ct. 710, 95 A.L.R.2d 1412]; see also *In re Capital Cities/ABC Inc.'s to Sealed Transc.* (3d Cir. 1990) 913 F.2d 89, 92 [when considering claimed First Amendment violations, reviewing courts "exercise substantially broader review" including "independent consideration of the [trial] court's order and the factual findings inferred from the evidence before it"]; *United States* v. *Smith* (3d Cir. 1986) 787 F.2d 111, 113, fn. 1 [recognizing reviewing courts' "special obligation" to independently examine the record in "the First Amendment context"].) The United States Supreme Court has explained the rationale for this heightened standard of review, in these words: " '[I]t is of prime importance that no constitutional freedom, least of all the guarantees of the Bill of Rights, be defeated by insubstantial findings of fact screening reality.' " (*NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886, 924 [73 L.Ed.2d 1215, 1243, 102 S.Ct. 3409], quoting *Drivers Union* v. *Meadowmoor Co.* (1941) 312 U.S. 287, 293 [85 L.Ed. 836, 841, 61 S.Ct. 552, 132 A.L.R. 1200].) I fear this is precisely what has happened in this court with this case.

The majority pays lip service to the independent judgment standard of review, but it does not give the trial evidence the careful scrutiny that the standard requires.

## II. FACTS AND PROCEEDINGS

The following are the relevant facts disclosed by application of the independent judgment standard of review to the record before this court. I begin with a description of the physical characteristics of the protest site, followed by a summary of pertinent trial court proceedings and the evidence presented in support of the permanent injunction at issue.

### A. *Physical Characteristics of the Protest Site*

The site of the demonstrations at issue in this case is a public sidewalk in front of a building on Broadway in the City of Vallejo. Inside the building is a medical clinic operated by Planned Parenthood. The record discloses that the clinic is set well back from the street and sidewalk, with its entrances at or near the back of the building.

More precisely, the record shows that the clinic occupies the back of a one-story building, with a tax service business occupying the front. The staff

entrance to the clinic is in the back of the building; its public entrance is on the side of the building near the back corner. The lot on which the building is situated is approximately 100 feet wide and 184 feet deep; the building itself is 36 feet wide and 64 feet deep.

In front of the building, between the tax service and the public sidewalk, is a parking area that extends around one side and to the back of the building. The distance between building and sidewalk is 44 feet. Two driveways intersect the sidewalk, providing clients and staff of the tax service and clinic with access to Broadway, a busy four-lane avenue. Across Broadway from the tax service and the clinic is an office occupied by Birthright of Vallejo/Benicia, an organization that opposes abortion.

## B. *The Complaint and the Temporary Restraining Order*

This case began on August 8, 1990, when Planned Parenthood filed its verified complaint for injunctive relief. The complaint named as defendants Citizens for Life and Christine Williams, its director.

The complaint alleged that defendants, beginning in March 1990, had intimidated and harassed workers and clients of Planned Parenthood by verbally assaulting people entering and leaving the parking lot, by physically obstructing the driveway, and by forcing or attempting to force anti-abortion literature on people and vehicles at or near the clinic. The complaint further alleged that defendants had "disrupted and attempted to disrupt" business at the clinic through nonamplified noise and by gaining or attempting to gain entrance to the parking lot, grounds, walkways, and offices.

In the complaint, Planned Parenthood asked the court to enjoin defendants from (1) trespassing on clinic property, (2) blocking the driveway, (3) harassing or threatening any person entering or leaving the clinic, (4) shouting words "likely to disturb the peace" of Planned Parenthood, its staff, or its clients, (5) bringing children to the picket line, (6) shouting or using amplification devices to disturb Planned Parenthood's business, and (7) otherwise attempting to intimidate and harass Planned Parenthood's staff and clients.

The complaint also specifically asked the trial court to restrict the number of picketers "to two on the public sidewalk." Planned Parenthood supported this request with two declarations, one by its attorney and the other by Janine Schoenfeld, Planned Parenthood's "escort coordinator." In her declaration, Schoenfeld described the anti-abortion protest activities of members and supporters of Citizens for Life. She then set forth the scope and justification

for the proposed limit on the number of picketers, in these words: "One picket could stand on one of the sidewalks, and one on the other side of the driveway in safety in order to get their message across. All people going into the clinic would have to pass their signs. Their viewpoint would be clear to passers-by on Broadway."

On the same day (August 8, 1990), the trial court issued a temporary restraining order (hereafter TRO) that, among other things,[1] allowed no more than two protesters on the sidewalk directly in front of the clinic. The TRO remained in effect until the trial court dissolved it on August 28, 1990.

## C. *The Hearing and the Preliminary Injunction*

On September 12, 1990, the court held a hearing on Planned Parenthood's motion for a preliminary injunction. The witnesses at the hearing were Janice Schoenfeld (the Planned Parenthood employee whose declaration had been submitted with the complaint) and Jeanette Hammer, an anti-abortion protester.

Schoenfeld testified that her job at the clinic included escorting women into the clinic from the parking lot on days that the clinic provided abortion services. Of particular relevance for our purposes, she testified that the protests organized by defendants began in March 1990, that she had never asked the police to arrest any protesters, that she had never made a citizen's arrest of any of the protesters, and that the police had come to the site once and had then admonished the protesters to stay on the sidewalk and to leave alone any person who so requested.

Hammer testified that she had picketed the clinic and had volunteered her services as a counselor to women approaching or leaving the clinic. She also testified that she had undergone an abortion herself and that this experience had led her to the view that pregnant women need information to help them make the important decision of whether or not to have an abortion.

One week after the hearing, on September 19, 1990, the court issued a preliminary injunction. In relevant part, the preliminary injunction "[r]estrict[ed] picketing and/or counseling to the public sidewalk in front of the building" but nonetheless provided that defendants could "maintain four (4)

---

[1]The TRO also prohibited the protesters from blocking the entrances to the parking lot, verbally harassing or making noises likely to disturb the peace of the clients and staff of the clinic, bringing children to the property, recording license numbers, or photographing persons coming to and from the building. These aspects of the TRO, and similar provisions in the preliminary and permanent injunctions, are not at issue here.

pickets and not more than two (2) shall be less than ten feet from any other picketer or counselor." The preliminary injunction remained in force until August 1, 1991, when the trial court issued the permanent injunction.

## D. *The Trial and the Permanent Injunction*

Planned Parenthood's application for a permanent injunction was tried to the court on April 18, 1991. On that date, the preliminary injunction had already been in force for seven months. The trial lasted less than four hours and included the testimony of just three witnesses, all called by Planned Parenthood.

One of the witnesses was Janice Schoenfeld, the Planned Parenthood employee who had previously testified in support of the preliminary injunction. At the trial, she testified as follows: Before the issuance of the injunction, there had been eight picketers outside the clinic or in the clinic's parking lot, and on one weekend day there had been nearly one hundred protesters on the sidewalk in front of the clinic. In August of 1990, a police officer had told her that a representative of defendant Citizens for Life had contacted the police to find out "the rules regarding picketing at the clinic." With respect to events occurring after issuance of the preliminary injunction, the record shows the following exchange:

"Q. [by counsel for Planned Parenthood] Have you observed picket activity since the injunction?

"A. [by Schoenfeld] Yes, but they followed the injunction usually, except for picketers.

"[Counsel for Planned Parenthood]: Thank you. I have nothing further. Thank you.

"THE COURT: You say that they followed the injunction?

"THE WITNESS: They followed the injunction, yes since the injunction."

Schoenfeld was never asked to explain her cryptic remark that the protesters had obeyed the injunction "except for the picketers." The only elucidation was provided by the trial court's follow-up question, in which Schoenfeld reaffirmed that "they" had "followed the injunction." To the extent this equivocal remark might be construed as evidence that "picketers" had not "followed the injunction" (the majority does so construe it), it is the legal conclusion of a lay witness, unsupported by specific facts, and thus not

competent evidence. (See Evid. Code, § 800; *People* v. *De Santis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210]; *Lombardo* v. *Santa Monica Young Men's Christian Assn.* (1985) 169 Cal.App.3d 529, 540 [215 Cal.Rptr. 224]; *Pond* v. *Insurance Co. of North America* (1984) 151 Cal.App.3d 280, 289 [198 Cal.Rptr. 517].)

Another trial witness was Marsha Anderson, the clinic's director. At one point in her testimony, she stated: "I called the police to issue the injunction a couple of times, to hand it out to people who were on the sidewalk and were about to break the rules, or breaking the rules." Because the majority relies upon this statement as evidence that "police enforcement of the terms of the preliminary injunction had been necessary" (maj. opn., *ante*, at p. 866), this statement deserves careful examination.

In her testimony, Anderson never explained what specific acts by the protesters led her to conclude that they were "about to break the rules, or breaking the rules." Thus her testimony suffers from the same defect as the testimony of Schoenfeld: it is the legal conclusion of a lay witness, unsupported by specific facts, and thus it is not competent evidence. (Evid. Code, § 800.) Apparently seeking to avoid this difficulty, the majority infers that these "rule" violations consisted of specific acts, such as writing down license plate numbers and handing literature through car windows in the parking lot, that Anderson had described earlier in her testimony. But the record will not permit this inference. Rather, the record shows that plaintiff's counsel asked Anderson to describe incidents "that occurred during the period of picketing *before the injunction*" (italics added), and the record shows that Anderson's descriptions of specific acts were in answer to this question. Anderson never stated that the protesters engaged in the same or similar conduct *after* issuance of the preliminary injunction, nor is there any evidence in the record to support a reasonable inference that such conduct occurred.

The third trial witness was defendant Christine Williams, the director of Citizens for Life. She testified that Planned Parenthood had called the police in August of 1990, but that since the injunction the picketing had been lawful.

On August 1, 1991—four months after the trial and eleven months after issuance of the preliminary injunction—the trial court issued a permanent injunction ordering that "[a]ll picketing, demonstrating or counseling at the PLANNED PARENTHOOD building shall only take place along the public sidewalk across the street from the PLANNED PARENTHOOD building."

### III. First Amendment Analysis

The First Amendment prohibits all government action abridging freedom of speech and assembly. (U.S. Const., 1st Amend.) The United States Supreme Court has described this constitutional guarantee, and its role in our political system, this way: "The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." (*Cohen v. California* (1971) 403 U.S. 15, 24 [29 L.Ed.2d 284, 293, 91 S.Ct. 1780].)

Because this case concerns an injunction that prohibits picketing and distributing literature on a public sidewalk, there can be no doubt that the First Amendment is implicated. Picketing and leafleting are expressive activities at the core of the First Amendment. (See, e.g., *Boos* v. *Barry* (1988) 485 U.S. 312, 318 [99 L.Ed.2d 333, 342-343, 108 S.Ct. 1157]; *United States* v. *Grace* (1983) 461 U.S. 171, 176-177 [75 L.Ed.2d 736, 742-744, 103 S.Ct. 1702].) And a public sidewalk is a quintessential public forum, a place traditionally used for exchanging ideas and expressing opinions. (*Frisby* v. *Schultz* (1988) 487 U.S. 474, 480 [101 L.Ed.2d 420, 428-429, 108 S.Ct. 2495]; *Cornelius* v. *NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788, 802 [87 L.Ed.2d 567, 579-580, 105 S.Ct. 3439]; *Clark* v. *Burleigh* (1992) 4 Cal.4th 474, 482 [14 Cal.Rptr.2d 455, 841 P.2d 975].)

Yet, even in a public forum, the government may impose reasonable restrictions on the time, place, and manner of speech. To be reasonable, however, the restrictions must be (1) content neutral, (2) narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication. (*Ward* v. *Rock Against Racism* (1989) 491 U.S. 781, 791 [105 L.Ed.2d 661, 675, 109 S.Ct. 2746].)

#### A. *Content Neutrality*

The permanent injunction's establishment of a protective buffer zone on the sidewalk in front of the clinic is, on its face, neutral as to content. It prohibits all speech in the buffer zone, not just speech carrying a certain message. But to satisfy the constitutional requirement of content neutrality, it is not enough that the restriction itself is neutral as to content. The justification for the restriction must take no account of the content of the

restricted speech. (*Ward* v. *Rock Against Racism*, *supra*, 491 U.S. 781, 791 [105 L.Ed.2d 661, 675] ["Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.' "].)

Insofar as the justification for the buffer zone is ensuring ingress and egress to the clinic, it is content neutral. Regardless of their message, protesters may be enjoined from blocking driveways or otherwise physically obstructing the passage of automobiles and pedestrians going to or coming from the clinic. Also content neutral is the justification that excessive noise levels from sidewalk protesters could compromise the medical treatment and welfare of patients within the clinic. No matter what the message sought to be conveyed, excessively noisy speech can be enjoined when it interferes with sound medical practice.

But the majority may violate the content neutrality requirement when it suggests that the buffer zone may be justified as a means of preventing emotional or psychological distress to women seeking abortion or other pregnancy-related services at the clinic. (See maj. opn., *ante*, at pp. 873-874.) This emotional distress may in large measure be attributable to the content of the anti-abortion message, and not merely the manner in which the content is expressed. To the extent this is true, the offered justification is impermissible, for restrictions on speech may not be based on how the message affects those who receive it. (*Texas* v. *Johnson* (1989) 491 U.S. 397, 414 [105 L.Ed.2d 342, 360, 109 S.Ct. 2533] ["government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"]; *Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415, 419 [29 L.Ed.2d 1, 5, 91 S.Ct. 1575] ["claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment"]; *Horizon Health Center* v. *Felicissimo* (1994) 135 N.J. 126, 139 [638 A.2d 1260, 1266]; see also Tribe, American Constitutional Law (2d ed. 1988) § 12-3, p. 795, fn. 4.)

B. *Alternative Channels of Communication*

The permanent injunction confines all picketing to the opposite side of a busy, four-lane avenue. Persons entering or leaving the clinic may not notice the protesters standing across the roadway, and unless they make the effort to cross that roadway, they will be unable to converse with the protesters in a normal tone of voice or to peruse or accept their offered literature. At this distance from persons entering and leaving the clinic, the only speech left to the protesters is that conveyed by placards and shouted slogans.

Moreover, there is a substantial risk that the protesters' message will be grossly misinterpreted by casual viewers. Because the protests must take place in front of the office of Birthright of Vallejo/Benicia, those passing by, including pregnant women contemplating abortion, may assume the protest is directed against that organization, which opposes abortions, rather than against the medical clinic, which provides them.

Under these circumstances, I conclude that the permanent injunction does not leave the protesters with ample alternative channels of communication.

## C. *Narrow Tailoring*

The majority incorrectly concludes that the prohibition here is narrowly tailored to serve a significant government interest. The government does, as the majority states (maj. opn., *ante*, p. 873), have a significant interest in safeguarding the health and safety of people seeking medical services (see, e.g., *Beth Israel Hospital* v. *NLRB* (1978) 437 U.S. 483 [57 L.Ed.2d 370, 98 S.Ct. 2463] [enforcing National Labor Relations Board order requiring hospital to allow union distribution of literature and solicitation in hospital cafeteria visited by patients]), and also in protecting private property and ensuring public safety (see *Horizon Health Center* v. *Felicissimo, supra*, 135 N.J. 126, 146-147 [638 A.2d 1260, 1270]). But identifying significant government interests is only part of the constitutional requirement. A restriction on speech must be narrowly tailored to serve those interests.

The preliminary injunction allowing four picketers on the sidewalk was in effect for eleven months. Had the terms of the preliminary injunction been less than completely effective in protecting the health and safety of the clinic's patients, Planned Parenthood would surely have presented detailed evidence of specific problems during this time. Indeed, as the plaintiff in the action (see Evid. Code, § 500), and as the party seeking to restrict speech (see *Healy* v. *James* (1972) 408 U.S. 169, 184-185 [33 L.Ed.2d 266, 281-282, 92 S.Ct. 2338]), Planned Parenthood was required to do so or have this crucial factual issue resolved against it. Yet the relevant evidence at trial, which I have summarized, includes no such testimony.

As this court has explained, a complete prohibition on picketing is permitted "where past picketing has become so irrevocably blended with acts of violence, physical intimidation or other unlawful conduct as to give rise to a justifiable belief that future picketing is likely to result in a continuance of the illegal acts." (*Steiner* v. *Long Beach Local No. 128* (1942) 19 Cal.2d 676, 683 [123 P.2d 20].) Conversely, when the picketing "has been in general lawful," even though there may have "infrequent illegal acts not of a serious

character," then a total prohibition on picketing is not permitted and "only the unlawful conduct will be enjoined." (*Id.* at p. 684.) Here, the evidence fails to establish that the protesters resorted to physical violence, nor does it establish repeated and serious violations of the preliminary injunction. I therefore conclude that the more severe restrictions of the permanent injunction, completely prohibiting speech on the public sidewalk in front of the clinic, were not reasonably necessary to protect the health and safety of the clinic's patients.

The majority offers various arguments against this conclusion, but none is persuasive.

Relying on a case upholding a limitation on noisy demonstrations (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 106 [33 L.Ed.2d 222, 226, 92 S.Ct. 2294]), the majority appears to suggest that the total ban on picketing within the sidewalk buffer zone is necessary to protect the patients inside the clinic from disturbance. (Maj. opn., *ante*, at p. 872.) But another portion of the permanent injunction, the legality of which is not before us, prohibits the picketers from "making any noise that can be heard inside the premises." Because this other provision adequately protects the patients inside the clinic from disruption, and because there is no credible evidence that sidewalk protesters generated excessive noise during the life of the preliminary injunction, the ban on picketing in front of the clinic may not be justified as a noise prevention measure.

The majority relies heavily on *Frisby* v. *Schultz, supra,* 487 U.S. 474, as supporting a complete prohibition of picketing directed against "captive" listeners. (Maj. opn., *ante,* at pp. 872-873 & fn. 6.) In *Frisby,* the United States Supreme Court upheld an ordinance prohibiting picketing " 'before or about the residence or dwelling of any individual . . . .' " (487 U.S. at p. 477 [101 L.Ed.2d at pp. 426-427].) The court found there were ample alternative opportunities for the exercise of free speech, emphasized the unique nature of the home as a citadel of repose, and concluded that the picketing in that case was not directed at the public. (*Id.* at pp. 485-486 [101 L.Ed.2d at pp. 432-433].)

The reasoning of *Frisby* does not support the majority's result here. This case involves picketing of a medical clinic, not a residence. The ample alternatives to picketing cited in *Frisby*—such as the ability of protesters to distribute literature door to door (487 U.S. at p. 484 [101 L.Ed.2d at pp. 431-432])—do not exist here because the anti-abortion protesters cannot effectively reach their intended audience—pregnant women contemplating

abortion—by distributing literature door to door. Their message, moreover, *is* directed to the public. Finally, the problem of "captive" listeners, to the extent it may once have existed in this case, has been effectively eliminated. The injunction expressly prohibits activity physically obstructing passage to and from the clinic, and Planned Parenthood presented no evidence at trial that passage was in fact obstructed during the life of the preliminary injunction.

Next, the majority asserts that the blanket prohibition against picketing in front of the clinic is necessary to prevent emotional trauma to patients entering the clinic, trauma which in some cases could endanger the health of the patients. As I have previously discussed, any such justification must be based on the manner rather than the content of the expression. Certainly, a court has the authority and obligation to enjoin any mode of expression that amounts to harassment or intimidation and that poses a significant health risk. And, just as certainly, pregnant women seeking access to health services, including abortion, must be protected from serious emotional trauma caused by abusive forms of expression. But the record in this case contains no evidence that women entering Planned Parenthood's clinic were subjected to any such harassment or intimidation during the 11-month life of the TRO and preliminary injunction. Thus, the emotional well-being of the clinic's patients had already received effective protection without the permanent injunction's total prohibition on speech within the buffer zone.

The majority accurately states that buffer zones around abortion clinics are "widely employed by state and federal courts in the context of anti-abortion protests." (Maj. opn., *ante*, p. 877.) But the majority fails to acknowledge that these same courts have either allowed a limited number of protesters within the buffer zone (e.g., *Northeast Women's Center, Inc.* v. *McMonagle* (3d Cir. 1991) 939 F.2d 57, 63-64 [six picketers permitted]; *Fargo Women's Health* v. *Lambs of Christ* (N.D. 1992) 488 N.W.2d 401, 407-408 [two picketers permitted]), or they have drawn the boundaries of the buffer zone so narrowly that protesters standing outside can still communicate effectively with persons entering and leaving the clinic (e.g., *Pro-Choice Network* v. *Project Rescue* (W.D.N.Y. 1992) 799 F.Supp. 1417, 1434 [clear zone of only 15 feet from clinic entrances]; *Planned Parenthood* v. *Holy Angels Catholic Church* (N.D.Cal. 1991) 765 F.Supp. 617, 626 [clear zone of only 25 feet from clinic extrances]; *Bering* v. *Share* (1986) 106 Wn.2d 212, 231-233 [721 P.2d 918, 929-931] [picketing permitted on sidewalk next to, but not in front of, medical facility].)

Most recently, in *Horizon Health Center* v. *Felicissimo, supra*, 135 N.J. 126 [638 A.2d 1260], the New Jersey Supreme Court considered the validity

of an injunction that prohibited all picketing on a public sidewalk in front of an abortion and family planning clinic. The injunction followed a noisy demonstration by 120 to 140 anti-abortion protesters that had blocked not only the sidewalk, but also a portion of the street in front of the clinic, and that had caused half of the women scheduled to appear at the clinic to cancel their appointments.

Nonetheless, the New Jersey Supreme Court concluded that the facts of the case "lend themselves to a more permissive restriction than the one the trial court imposed," and that "rather than prohibiting all expressional activities on the sidewalk directly in front of the [clinic], the injunction should have allowed a limited, controlled form of expression near the entrance while restraining the troublesome mass of protestors to a location across the street." (*Horizon Health Center* v. *Felicissimo, supra,* 135 N.J. 126, 152 [638 A.2d 1260, 1273].) Unlike the majority in this case, the New Jersey Supreme Court recognized its obligation to balance the protected interests of *both* the demonstrators and the patients. In the court's words, "The injunction should give consideration to the right of the protestors to make their presence known and to the role of sidewalk counselling in that process, while at the same time protecting against any harassment of the patients or others who wish to enter the clinic." (*Id.* at p. 1273.)

Admittedly, the constitutional requirement of narrow tailoring does not mean that a time, place, and manner restriction on speech must be the "least restrictive" alternative. (*Ward* v. *Rock Against Racism, supra,* 491 U.S. 781, 798 [105 L.Ed.2d 661, 680].) But it emphatically *does* mean that any such restriction may not burden "substantially more speech than is necessary to further the government's legitimate interests." (*Id.* at p. 799 [105 L.Ed.2d at p. 681]; see also, *Carroll* v. *Princess Anne* (1976) 393 U.S. 175, 183 [21 L.Ed.2d 325, 332-333, 89 S.Ct. 347] [stating that an order restricting peaceful picketing "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order"].) Here, the issue posed by the sidewalk prohibition is not just "quibbling over a few feet," as the majority would have us believe. (Maj. opn., *ante,* p. 879.) The difference between the preliminary injunction, allowing carefully restricted speech within the buffer zone, and the permanent injunction, exiling all protesters across a broad avenue, is substantial and must be fully justified. The record utterly fails to provide the required justification.

For these reasons, the permanent injunction's sidewalk restriction, totally prohibiting speech within the buffer zone, does not satisfy the constitutional requirement of narrow tailoring.

## IV. Conclusion

In this case, anti-abortion protesters sought to express their views in front of a medical clinic by picketing and distributing literature, protected First Amendment activities that cannot be enjoined merely because the anti-abortion content of the message is offensive or even upsetting to the clinic's staff and to women seeking abortion services. The abortion protesters sought to engage in these activities on a public sidewalk, a place that by long tradition has been recognized as an appropriate and constitutionally protected site for expression protected by the First Amendment. The clinic, for its part, has sought to prevent activities by the protesters that threaten the health of its patients or otherwise substantially interfere with its operations.

The trial court granted a preliminary injunction allowing only four protesters on the sidewalk, limiting the noise level of the protests, and barring obstructive behavior. The 11-month life of the preliminary injunction was ample to test its effectiveness in controlling abusive and obstructive conduct by the protesters. Had the protesters resorted to physical violence at any time, or had they committed serious and willful violations of the preliminary injunction, I would have no hesitation in affirming an order excluding them from the sidewalk buffer zone. As I said earlier, courts have the authority and the obligation to protect pregnant women seeking access to health services from serious emotional trauma caused by abusive methods of expression. But the record contains no evidence from which this court can conclude with any sort of confidence that the preliminary injunction was at all inadequate to protect the health and safety of the clinic's patients.

The sensitive adjustment of competing rights and interests that the federal Constitution requires was achieved in this case by the preliminary injunction. There was no need, practically or legally, to banish the protesters to the opposite side of the street, thereby barring them from peacefully expressing their views on the public sidewalk in front of the clinic. Therefore, I must conclude that the permanent injunction's sidewalk restriction is invalid under the First Amendment to the United States Constitution.

The United States Supreme Court granted a petition for a writ of certiorari on October 31, 1994 (No. 94-334). The judgment was vacated and cause remanded on that date to the Supreme Court of California for further consideration.